TURNER *v.* UNITED STATES

No. 190.   Argued October 15, 1969—Decided January 20, 1970

*Josiah E. DuBois, Jr.,* by appointment of the Court, 395 U. S. 973, argued the cause and filed a brief for petitioner.

*Lawrence G. Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Jerome M. Feit,* and *Sidney M. Glazer.*

*Steven R. Rivkin* argued the cause and filed a brief for Cleveland Burgess as *amicus curiae* urging reversal.

Mr. Justice White delivered the opinion of the Court.

Petitioner was found guilty by a jury on four counts charging violations of the federal narcotics laws. The issue before us is the validity of the provisions of § 2 of the Act of February 9, 1909, 35 Stat. 614, as amended, 21 U. S. C. § 174, and 26 U. S. C. § 4704 (a) which authorize an inference of guilt from the fact of possession of narcotic drugs, in this case heroin and cocaine.

The charges arose from seizures by federal narcotics agents of two packages of narcotics. On June 1, 1967, Turner and two companions were arrested in Weehawken, New Jersey, shortly after their automobile emerged from the Lincoln Tunnel. While the companions were being searched but before Turner was searched, the arresting agents saw Turner throw a package to the top of a nearby wall. The package was retrieved and was found to be a foil package weighing 14.68 grams and containing a mixture of cocaine hydrochloride and sugar, 5% of which was cocaine. Government agents thereafter found a tinfoil package containing heroin under the front seat of the car. This package weighed 48.25 grams and contained a mixture of heroin, cinchonal alkaloid, mannitol, and sugar, 15.2% of the mixture being heroin. Unlike the cocaine mixture, the heroin mixture was packaged within the tinfoil wrapping in small double glassine bags; in the single tinfoil package there were 11 bundles of bags, each bundle containing 25 bags (a total of 275 bags). There were no federal tax stamps affixed to the package containing the cocaine or to the glassine bags or outer wrapper enclosing the heroin.

Petitioner was indicted on two counts relating to the heroin and two counts relating to the cocaine. The first count charged that Turner violated 21 U. S. C. § 174 [1]

---

[1] Insofar as here relevant, this section provides:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned . . . .

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize

by receiving, concealing, and facilitating the transportation and concealment of heroin while knowing that the heroin had been unlawfully imported into the United States. The third count charged the same offense with regard to the cocaine seized. The second count charged that petitioner purchased, possessed, dispensed, and distributed heroin not in or from the original stamped package in violation of 26 U. S. C. § 4704 (a).[2] The fourth count made the same charge with regard to the cocaine.

At the trial, the Government presented the evidence of the seizure of the packages containing heroin and cocaine but presented no evidence on the origin of the drugs possessed by petitioner. Petitioner did not testify. With regard to Counts 1 and 3, the trial judge charged the jury in accord with the statute that the jury could infer from petitioner's unexplained possession of the heroin and cocaine that petitioner knew that the drugs he possessed had been unlawfully imported. With regard to Counts 2 and 4, the trial judge read to the jury the statutory provision making possession of drugs not in a stamped package "prima facie evidence" that the defendant purchased, sold, dispensed, or dis-

conviction unless the defendant explains the possession to the satisfaction of the jury."

Heroin, a derivative of opium, and cocaine, a product of coca leaves, are within the meaning of the term "narcotic drug" as used in 21 U. S. C. § 174. See 21 U. S. C. § 171 (which refers to § 3228 (g) of Int. Rev. Code of 1939, now 26 U. S. C. § 4731 (a)).

[2] "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found."

The term "narcotic drugs" is defined to include derivatives of opium and products of coca leaves. 26 U. S. C. § 4731 (a).

tributed the drugs not in or from a stamped package. The jury returned a verdict of guilty on each count. Petitioner was sentenced to consecutive terms of 10 years' imprisonment on the first and third counts; a five-year term on the second count was to run concurrently with the term on the first count and a five-year term on the fourth count was to run concurrently with the term on the third count.

On appeal to the Court of Appeals for the Third Circuit, petitioner argued that the trial court's instructions on the inferences that the jury might draw from unexplained possession of the drugs constituted violations of his privilege against self-incrimination by penalizing him for not testifying about his possession of the drugs. The Court of Appeals rejected this claim and affirmed, finding that the inferences from possession authorized by the statutes were permissible under prior decisions of this Court and that therefore there was no impermissible penalty imposed on petitioner's exercise of his right not to testify. 404 F. 2d 782 (1968). After the Court of Appeals' decision in this case, this Court held that a similar statutory presumption applicable to the possession of marihuana was unconstitutional as not having a sufficient rational basis. *Leary* v. *United States*, 395 U. S. 6 (1969). We granted a writ of certiorari in this case to reconsider in light of our decision in *Leary* whether the inferences authorized by the statutes here at issue are constitutionally permissible when applied to the possession of heroin and cocaine. 395 U. S. 933.

I

The statutory inference created by § 174 has been upheld by this Court with respect to opium and heroin, *Yee Hem* v. *United States,* 268 U. S. 178 (1925); *Roviaro* v. *United States,* 353 U. S. 53 (1957), as well as by an

unbroken line of cases in the courts of appeals.[3] Similarly, in a case involving morphine, this Court has rejected a constitutional challenge to the inference authorized by § 4704 (a). *Casey* v. *United States,* 276 U. S. 413 (1928).

*Leary* v. *United States, supra,* dealt with a statute, 21 U. S. C. § 176a, providing that possession of marihuana, unless explained to the jury's satisfaction, "shall be deemed sufficient evidence to authorize conviction" for smuggling, receiving, concealing, buying, selling, or facilitating the transportation, concealment, or sale of the drug, knowing that it had been illegally imported. Referring to prior cases[4] holding that a statute authorizing the inference of one fact from the proof of another in criminal cases must be subjected to scrutiny by the courts to prevent "conviction upon insufficient proof," 395 U. S., at 37, the Court read those cases as

---

[3] Decisions of the courts of appeals accepting application of the presumption to persons found in possession of opium, morphine, or heroin include *Gee Woe* v. *United States,* 250 F. 428 (C. A. 5th Cir.), cert. denied, 248 U. S. 562 (1918) (smoking opium); *Charley Toy* v. *United States,* 266 F. 326 (C. A. 2d Cir.), cert. denied, 254 U. S. 639 (1920) (smoking opium); *Copperthwaite* v. *United States,* 37 F. 2d 846 (C. A. 6th Cir. 1930) (morphine); *United States* v. *Liss,* 105 F. 2d 144 (C. A. 2d Cir. 1939) (morphine); *Dear Check Quong* v. *United States,* 82 U. S. App. D. C. 8, 160 F. 2d 251 (1947) (unspecified narcotics); *Cellino* v. *United States,* 276 F. 2d 941 (C. A. 9th Cir. 1960) (heroin); *Walker* v. *United States,* 285 F. 2d 52 (C. A. 5th Cir. 1960) (heroin); *United States* v. *Savage,* 292 F. 2d 264 (C. A. 2d Cir.), cert. denied, 368 U. S. 880 (1961) (heroin); *United States* v. *Gibson,* 310 F. 2d 79 (C. A. 2d Cir. 1962) (heroin); *Lucero* v. *United States,* 311 F. 2d 457 (C. A. 10th Cir. 1962), cert. denied *sub nom. Maestas* v. *United States,* 372 U. S. 936 (1963) (heroin); *Garcia* v. *United States,* 373 F. 2d 806 (C. A. 10th Cir. 1967) (heroin).

[4] Especially *Tot* v. *United States,* 319 U. S. 463 (1943), *United States* v. *Gainey,* 380 U. S. 63 (1965), and *United States* v. *Romano,* 382 U. S. 136 (1965).

requiring the invalidation of the statutorily authorized inference "unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." 395 U. S., at 36. Since, judged by this standard, the inference drawn from the possession of marihuana was invalid, it was unnecessary to "reach the question whether a criminal presumption which passes muster when so judged must also satisfy the criminal 'reasonable-doubt' standard if proof of the crime charged or an essential element thereof depends upon its use." 395 U. S., at 36 n. 64.

We affirm Turner's convictions under §§ 174 and 4704 (a) with respect to heroin (Counts 1 and 2) but reverse the convictions under these sections with respect to cocaine (Counts 3 and 4).

## II

We turn first to the conviction for trafficking in heroin in violation of § 174. Count 1 charged Turner with (1) knowingly receiving, concealing, and transporting heroin which (2) was illegally imported and which (3) he knew was illegally imported. See *Harris* v. *United States,* 359 U. S. 19, 23 (1959). For conviction, it was necessary for the Government to prove each of these three elements of the crime to the satisfaction of the jury beyond a reasonable doubt. The jury was so instructed and Turner was found guilty.

The proof was that Turner had knowingly possessed heroin; since it is illegal to import heroin or to manufacture it here,[5] he was also chargeable with knowing that his heroin had an illegal source. For all practical purposes, this was the Government's case. The trial judge, noting that there was no other evidence of im-

---

[5] See *infra,* nn. 12, 13.

portation or of Turner's knowledge that his heroin had come from abroad, followed the usual practice and instructed the jury—as § 174 permits but does not require—that possession of a narcotic drug is sufficient evidence to justify conviction of the crime defined in § 174.[6]

The jury, however, even if it believed Turner had possessed heroin, was not required by the instructions to find him guilty. The jury was instructed that it was the sole judge of the facts and the inferences to be drawn therefrom, that all elements of the crime must be proved beyond a reasonable doubt, and that the inference authorized by the statute did not require the defendant to present evidence. To convict, the jury was informed, it "must be satisfied by the totality of the evidence irre-

---

[6] Under prior decisions, principally *United States* v. *Gainey,* 380 U. S. 63 (1965), such statutory provisions authorize but do not require the trial judge to submit the case to the jury when the Government relies on possession alone, authorize but do not require an instruction to the jury based on the statute, and authorize but do not require the jury to convict based on possession alone. The defendant is free to challenge either the inference of illegal importation or the inference of his knowledge of that fact, or both. *Harris* v. *United States,* 359 U. S. 19, 23 (1959); *Roviaro* v. *United States,* 353 U. S. 53, 63 (1957); *Yee Hem* v. *United States,* 268 U. S. 178, 185 (1925); *United States* v. *Peeples,* 377 F. 2d 205 (C. A. 2d Cir. 1967); *Chavez* v. *United States,* 343 F. 2d 85 (C. A. 9th Cir. 1965); *Griego* v. *United States,* 298 F. 2d 845 (C. A. 10th Cir. 1962). Even when the defendant challenges the validity of the inference as applied to his case, the instruction on the statutory inference is normally given. See, *e. g., McIntyre* v. *United States,* 380 F. 2d 746 (C. A. 9th Cir.), cert. denied, 389 U. S. 952 (1967); *United States* v. *Peeples, supra; Vick* v. *United States,* 113 U. S. App. D. C. 12, 304 F. 2d 379 (1962); *Griego* v. *United States, supra; Walker* v. *United States,* 285 F. 2d 52 (C. A. 5th Cir. 1960); *United States* v. *Feinberg,* 123 F. 2d 425 (C. A. 7th Cir. 1941), cert. denied, 315 U. S. 801 (1942). See also *Erwing* v. *United States,* 323 F. 2d 674 (C. A. 9th Cir. 1963); *Caudillo* v. *United States,* 253 F. 2d 513 (C. A. 9th Cir.), cert. denied *sub nom. Romero* v. *United States,* 357 U. S. 931 (1958).

spective of the source from which it comes of the guilt of the defendant . . . ." The jury was obligated by its instructions to assess for itself the probative force of possession and the weight, if any, to be accorded the statutory inference. If it is true, as the Government contends, that heroin is not produced in the United States and that any heroin possessed here must have originated abroad, the jury, based on its own store of knowledge, may well have shared this view and concluded that Turner was equally well informed. Alternatively, the jury may have been without its own information concerning the sources of heroin, and may have convicted Turner in reliance on the inference permitted by the statute, perhaps reasoning that the statute represented an official determination that heroin is not a domestic product.[7]

Whatever course the jury took, it found Turner guilty beyond a reasonable doubt and the question on review is the sufficiency of the evidence, or more precisely, the soundness of inferring guilt from proof of possession alone. Since the jury might have relied heavily on the inferences authorized by the statute and included in the court's instructions, our primary focus is on the validity of the evidentiary rule contained in § 174.[8]

---

[7] In *United States* v. *Peeples, supra,* the jury, after deliberating for a time, asked the judge about the percentage of heroin in the United States that is produced illegally in this country. "As there was no evidence in the record concerning areas of the world where heroin is produced, the judge declined to answer the . . . inquiry . . . ." 377 F. 2d, at 208. The defendant was found guilty by the jury; however, the Court of Appeals reversed for reasons not directly related to the trial judge's treatment of the question about the origins of heroin possessed in this country.

[8] See *Leary* v. *United States,* 395 U. S. 6, 31–32 (1969); *United States* v. *Romano, supra,* at 138–139 (1965); *Bailey* v. *Alabama,* 219 U. S. 219, 234–235 (1911).

Arguably, in declaring possession to be ample evidence to convict for trafficking in illegally imported drugs, Congress in effect has

We conclude first that the jury was wholly justified in accepting the legislative judgment—if in fact that is what the jury did—that possession of heroin is equivalent to possessing imported heroin. We have no reasonable doubt that at the present time heroin is not produced in this country and that therefore the heroin Turner had was smuggled heroin.

Section 174 or a similar provision has been the law since 1909.[9] For 60 years defendants charged under the

made possession itself a crime as an incident to its power over foreign commerce. Cf. *Ferry* v. *Ramsey*, 277 U. S. 88 (1928). But the crime defined by the statute is not possession and the Court has rejected this basis for sustaining this and similar statutory inferences. *Leary* v. *United States, supra*, at 34, 37; *United States* v. *Romano, supra*, at 142–144; *Harris* v. *United States, supra*, at 23; *Roviaro* v. *United States, supra*, at 62–63; *Tot* v. *United States, supra*, at 472.

The Court has also refused to accept the suggestion that since the source of his drugs is perhaps more within the defendant's knowledge than the Government's, it violates no rights of the defendant to permit conviction based on possession alone when the defendant refuses to demonstrate a legal source for his drugs. *Leary* v. *United States, supra*, at 32–34. See also *Tot* v. *United States, supra*, at 469–470. The difficulties with the suggested approach are obvious: if the Government proves only possession and if possession is itself insufficient evidence of either importation or knowledge, but the statute nevertheless permits conviction where the defendant chooses not to explain, the Government is clearly relieved of its obligation to prove its case, unaided by the defendant, and the defendant is made to understand that if he fails to explain he can be convicted on less than sufficient evidence to constitute a prima facie case. See *Tot* v. *United States, supra*, at 469.

[9] The original provision, applicable to opium and derivatives, was contained in the Act of February 9, 1909, § 2, 35 Stat. 614. It was revised and extended to cover cocaine and coca leaves by the Act of May 26, 1922, § 1, 42 Stat. 596. The provision establishing the presumption was adopted without extended discussion or debate; it was consciously modeled on a provision of § 3082

statute have known that the section authorizes an inference of guilt from possession alone, that the inference is rebuttable by evidence that their heroin originated here, and that the inference itself is subject to challenge for lack of sufficient connection between the proved fact of possession and the presumed fact that theirs was smuggled merchandise. *Mobile, J. & K. C. R. Co.* v. *Turnipseed,* 219 U. S. 35, 43 (1910). Given the statutory inference and absent rebuttal evidence, as far as a defendant is concerned the § 174 crime is the knowing possession of heroin. Hence, if he is to avoid conviction, he faces the urgent necessity either to rebut or to challenge successfully the possession inference by demonstrating the fact or the likelihood of a domestic source for heroin, not necessarily by his own testimony but through the testimony of others who are familiar with the traffic in drugs, whether government agents or private experts. Over the years, thousands of defendants, most of them represented by retained or appointed counsel, have been convicted under § 174. Although there was opportunity in every case to challenge or rebut the inference based on possession, we are cited to no case, and we know of none, where substantial evidence showing domestic production of heroin has come to light. Instead, the inference authorized by the section, although frequently challenged, has been upheld in this Court and in countless cases in the district courts and courts of appeals, these cases implicitly reflecting the prevailing judicial view that heroin is not made in this country but rather is imported from abroad. If this view is erroneous and heroin is or has

of the Revised Statutes (now in 18 U. S. C. § 545), originating in the Smuggling Act of 1866, § 4, 14 Stat. 179. See H. R. Rep. No. 1878, 60th Cong., 2d Sess., 1–2 (1909); H. R. Rep. No. 2003, 60th Cong., 2d Sess., 1 (1909). See also Sandler, The Statutory Presumption in Federal Narcotics Prosecutions, 57 J. Crim. L. C. & P. S. 7 (1966).

been produced in this country in commercial quantities, it is difficult to believe that resourceful lawyers with adversary proceedings at their disposal would not long since have discovered the truth and placed it on record.

This view is supported by other official sources. In 1956, after extensive hearings, the Senate Committee on the Judiciary found no evidence that heroin is produced commercially in this country.[10] The President's Commission on Law Enforcement and Administration of Justice stated in 1967 that "[a]ll the heroin that reaches the American user is smuggled into the country from

[10] In 1955 the Subcommittee on Improvements in the Federal Criminal Code of the Senate Committee on the Judiciary held hearings throughout the country on the illicit narcotics traffic in this country. The subcommittee heard 345 witnesses, including government officials, law enforcement officers, and addicts and narcotics law violators; the testimony heard covers several thousand pages. Hearings on Illicit Narcotics Traffic before the Subcommittee on Improvements in the Federal Criminal Code of the Senate Committee on the Judiciary, 84th Cong., 1st Sess. (1955) (hereinafter cited as 1955 Senate Hearings). The evidence gathered in these hearings was the basis of S. 3760, 84th Cong., 2d Sess. (1956). The Senate bill contained a section (proposed § 1402, Tit. 18) very similar to § 174 but applicable exclusively to heroin; this proposed section included the § 174 presumption. Another proposed section (proposed § 1403, Tit. 18, enacted with minor changes and now codified in 21 U. S. C. § 176b) authorized special, severe penalties for the sale of unlawfully imported heroin to juveniles; this section contained a provision that possession of heroin was sufficient to prove that the heroin had been illegally imported. See S. Rep. No. 1997, 84th Cong., 2d Sess., 30 (1956) (proposed §§ 1402, 1403). The presumption that heroin found in this country has been illegally imported was based on findings of the Committee that foreign sources supply all important quantities of heroin circulating in this country, *id.*, at 3–7; and these findings were in turn based on ample evidence presented to the Subcommittee on Improvements in the Federal Criminal Code. See 1955 Senate Hearings 90 (testimony of Commissioner Anslinger of the Federal Bureau of Narcotics).

abroad, the Middle East being the reputed primary point of origin." [11]

The factors underlying these judgments may be summarized as follows: First, it is plain enough that it is illegal both to import heroin into this country [12] and to manufacture it here; [13] heroin is contraband and is subject to seizure.[14]

Second, heroin is a derivative of opium and can be manufactured from opium or from morphine or codeine,

---

[11] President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Narcotics and Drug Abuse 3 (1967) (hereinafter cited as Task Force Report). See also U. N. Commission on Narcotic Drugs, Report of the Eighteenth Session, U. N. Doc. E/CN.7/455, p. 15 (1963); S. Jeffee, Narcotics—An American Plan 12–14, 63–71 (1966).

[12] Title 21 U. S. C. § 173 makes it unlawful to import any narcotic drug except amounts of crude opium and coca leaves necessary to provide for medical and legitimate uses. In addition, for more than 45 years, it has been unlawful to import opium for the purpose of manufacturing heroin. Act of June 7, 1924, 43 Stat. 657 (now codified in 21 U. S. C. § 173). Though 21 U. S. C. § 513 permits the Secretary of the Treasury to authorize the importation of any narcotic drug for delivery to governmental officials or to any person licensed to use the drugs for scientific purposes, the Secretary has never authorized the importation of any heroin under this provision. Brief for the United States 18 n. 12.

[13] The Narcotics Manufacturing Act of 1960, 74 Stat. 55, 21 U. S. C. §§ 501–517, prohibits the manufacture of narcotic drugs except under a license issued by the Secretary of the Treasury for the production of an approved drug. Since heroin is not considered useful for medical purposes, no production for medical use has been authorized; heroin used in scientific experimentation is supplied entirely from quantities seized by law enforcement officials. Brief for the United States 17 n. 10.

[14] 21 U. S. C. § 173. See S. Rep. No. 1997, 84th Cong., 2d Sess., 7 (1956). In 1956, all heroin then lawfully outstanding was required to be surrendered. Act of July 18, 1956, § 201, 70 Stat. 572 (codified as 18 U. S. C. § 1402).

which are also derived from opium.[15] Whether heroin can be synthesized is disputed, but there is no evidence that it is being synthesized in this country.[16]

Third, opium is derived from the opium poppy which cannot be grown in this country without a license.[17] No licenses are outstanding for commercial cultivation [18] and

---

[15] The clandestine manufacture of heroin from opium or morphine is said in one report to be "child's play." Vaille & Bailleul, Clandestine Heroin Laboratories, 5 U. N. Bulletin on Narcotics, No. 4, Oct.-Dec. 1953, pp. 1, 6. The possibility of producing heroin from codeine (with a yield of about 22%) was first reported in Rapoport, Lovell, & Tolbert, The Preparation of Morphine-N-methyl-$C^{14}$, 73 J. Am. Chem. Soc. 5900 (1951), and was verified in Gates & Tschudi, The Synthesis of Morphine, 74 J. Am. Chem. Soc. 1109 (1952). The Bureau of Narcotics and Dangerous Drugs reports that conversion of codeine into morphine (from which heroin may be produced) is relatively simple and requires inexpensive equipment but produces an extremely noxious and penetrating odor which would make concealment of such conversion operations virtually impossible. Supplemental Memorandum for the United States 2.

[16] The Bureau of Narcotics and Dangerous Drugs reports that it knows of no case in which synthetic heroin has been produced; it reports that experiments indicate that production of synthetic morphine would be extremely difficult. Brief for the United States 20 n. 17. Amicus Burgess suggests the possibility of synthetic production of heroin but cites in support only a case involving an unsuccessful attempt to synthesize morphine, United States v. Liss, 137 F. 2d 995 (C. A. 2d Cir.), cert. denied, 320 U. S. 773 (1943). Brief for Cleveland Burgess as Amicus Curiae 11.

[17] Opium Poppy Control Act of 1942, 56 Stat. 1045, 21 U. S. C. §§ 188–188n.

[18] The regulations provide that a license to produce opium poppies shall be issued only when it is determined by the Director of the Bureau of Narcotics and Dangerous Drugs that the medical and scientific needs of the country cannot be met by the importation of crude opium. 21 CFR § 303.5 (a). Imports of crude opium have been sufficient to meet all domestic medical and scientific needs and the United States is therefore not an opium-

there is no evidence that the opium poppy is illegally grown in the United States.[19]

Fourth, the law forbids the importation of any opium product except crude opium required for medical and scientific purposes;[20] importation of crude opium for the purpose of making heroin is specifically forbidden.[21] Sizable amounts of crude opium are legally imported and used to make morphine and codeine.[22]

Fifth, the flow of legally imported opium and of legally manufactured morphine and codeine is controlled too tightly to permit any significant possibility that heroin is manufactured or distributed by those legally licensed to deal in opium, morphine, or codeine.[23]

---

producing country. Blum & Braunstein, Mind-Altering Drugs and Dangerous Behavior: Narcotics, in Task Force Report App. A–2, at 40. See also Brief for the United States 23 n. 25.

[19] The most recent reported case involving a prosecution for unlawful production of opium poppies is *Az Din* v. *United States*, 232 F. 2d 283 (C. A. 9th Cir.), cert. denied, 352 U. S. 827 (1956). Unlike the case of marihuana, see *Leary, supra,* at 42–43, there are no reports of the discovery in this country of fields of opium poppies requiring destruction. This fact together with the facts that opium poppies are hard to conceal because of their color and that the harvesting of opium is only economically feasible in countries with an abundant supply of cheap labor justifies a conclusion that little if any opium poppy production is going on in this country. See Brief for the United States 21–23.

[20] 21 U. S. C. § 173.

[21] *Ibid.* See *supra,* n. 12.

[22] In 1966, the United States imported 173,951 kilograms of crude opium; in the same year, 715 kilograms of morphine and 30,662 kilograms of codeine were produced from imported opium. U. S. Treasury Department, Bureau of Narcotics, Traffic in Opium and Other Dangerous Drugs, Report for the Year Ended December 31, 1967, p. 41 (1968).

[23] The manufacture of narcotic drugs is very carefully controlled and monitored under the Narcotics Manufacturing Act of 1960, 74 Stat. 55, 21 U. S. C. §§ 501–517. The subsequent distribution of

Sixth, there are recurring thefts of opium, morphine, and codeine from legal channels which could be used for the domestic, clandestine production of heroin.[24] It is extremely unlikely that heroin would be made from codeine since the process involved produces an unmanageable, penetrating stench which it would be very difficult to conceal.[25] Clandestine manufacture of heroin from opium and morphine would not be subject to this difficulty; but, even on the extremely unlikely assumption that all opium and morphine stolen each year is used to manufacture heroin, the heroin so produced would amount to only a tiny fraction (less than 1%) of the illicit heroin illegally imported and marketed here.[26] Moreover, a clandestine laboratory man-

narcotic drugs is controlled and monitored under the laws enforcing the taxes imposed on those dealing in narcotic drugs. 26 U. S. C. §§ 4701–4707, 4721–4736, 4771–4776.

[24] Because of the controls and reporting requirements applicable to those handling narcotic drugs, see *supra*, n. 23, the Bureau of Narcotics and Dangerous Drugs can compile accurate figures on the quantities of narcotic drugs stolen from legitimate channels. From 1964 through 1968, total thefts of medical opium per year ranged from 9.6 kilograms to 12.9 kilograms; thefts of morphine for the same period ranged from 6.7 kilograms to 10.2 kilograms per year; annual thefts of codeine for the same years ran between 30.0 kilograms and 81.8 kilograms. Brief for the United States 44. On the possibility of clandestine manufacture of heroin from opium, morphine, and codeine, see *supra*, n. 15.

[25] See *supra*, n. 15.

[26] Using figures on the number of known addicts and the average daily dose, federal agencies estimate that roughly 1,500 kilograms of heroin are smuggled into the United States each year. Task Force Report 6. The Bureau of Narcotics and Dangerous Drugs estimates that no more than about one kilogram of heroin could have been produced if all the opium stolen in any recent year had been clandestinely converted into heroin. The largest total amount of morphine stolen in a recent year would have yielded

ufacturing heroin has not been discovered in many years.[27]

Concededly, heroin could be made in this country, at least in tiny amounts. But the overwhelming evidence is that the heroin consumed in the United States

about 10.2 kilograms of heroin if it had all been converted into heroin. Brief for the United States 19 n. 15.

If it were assumed that all stolen codeine is converted into heroin, the figure for the possible clandestine domestic production of heroin would be well over 1% of the total heroin marketed in this country. Codeine can be made to yield about 22% heroin. See *supra*, n. 15. Applying this conversion rate to the largest annual amount of codeine stolen in the last five years (81.8 kilograms, see *supra*, n. 24) would give a figure of about 18 kilograms for the maximum amount of heroin that might have been produced from stolen codeine in any recent year. On the assumption that all stolen opium, morphine, and codeine is converted into heroin, the amount of heroin domestically produced from stolen opium and its derivatives would amount to no more than about 30 kilograms, only about 2% of the 1,500 kilograms of heroin estimated to be illegally imported each year. Whether such a percentage, rather than the figure of less than 1% obtained by excluding codeine from consideration, would alter our conclusions need not be discussed, for the fact that the conversion process creates a stench makes it unrealistic to assume that stolen codeine is clandestinely converted into heroin. See *supra*, n. 15.

[27] Statement by the United States Delegation on the Illicit Traffic to the Twenty-third Session of the U. N. Commission on Narcotic Drugs, January 1969, U. N. Doc. SD/E/CN.7/131, Annex A, p. 3. One respected work on narcotics makes the claim, without further elaboration, that "recent information" leads to the conclusion that some illicit laboratories used for the conversion of opium or morphine into heroin are located in the United States. D. Maurer & V. Vogel, Narcotics and Narcotic Addiction 64 (3d ed. 1967). However, the same statement, without elaboration, appears in the 1954 edition of the work, D. Maurer & V. Vogel, Narcotics and Narcotics Addiction 50, and this fact together with the absence of any cited basis for the claim and the lack of supporting evidence elsewhere in the literature leads us to believe that the statement, if it was ever correct, is no longer accurate.

is illegally imported. To possess heroin *is* to possess imported heroin. Whether judged by the more-likely-than-not standard applied in *Leary* v. *United States, supra,* or by the more exacting reasonable-doubt standard normally applicable in criminal cases, § 174 is valid insofar as it permits a jury to infer that heroin possessed in this country is a smuggled drug. If the jury relied on the § 174 instruction, it was entitled to do so.[28]

Given the fact that little if any heroin is made in the United States, Turner doubtless knew that the heroin he had came from abroad. There is no proof that he had specific knowledge of who smuggled his heroin or when or how the smuggling was done, but we are confident that he was aware of the "high probability" that the heroin in his possession had originated in a foreign country. Cf. *Leary* v. *United States, supra,* at 45–53.[29]

It may be that the ordinary jury would not always know that heroin illegally circulating in this country is not manufactured here. But Turner and others who sell or distribute heroin are in a class apart.[30] Such

[28] It is, of course, possible for the situation to change either through the development of a simple method of synthesizing heroin or through the creation of substantial clandestine operations utilizing opium or morphine which has been illegally imported or which, though legally here, has been stolen.

[29] The Court in *Leary,* 395 U. S., at 46 n. 93, employed the definition of "knowledge" in Model Penal Code § 2.02 (7) (Proposed Official Draft, 1962):

"When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist."

[30] Though the federal narcotics laws are in terms applicable to most possessors of illicit drugs regardless of whether the possessor is a user or a dealer, the enforcement efforts of the Bureau of Narcotics and Dangerous Drugs are directed to the development of

people have regular contact with a drug which they know cannot be legally bought or sold; their livelihood depends on its availability; some of them have actually engaged in the smuggling process. The price, supply, and quality vary widely;[31] the market fluctuates with the ability of smugglers to outwit customs and narcotics agents at home and abroad.[32] The facts concerning heroin are available from many sources, frequently in the popular media. "Common sense" (*Leary* v. *United States, supra,* at 46) tells us that those who traffic in heroin will inevitably become aware that the product they deal in is smuggled,[33] unless they practice a studied ignorance to which they are not entitled.[34] We therefore have little doubt that the inference of knowledge from the fact of possessing smuggled heroin is a sound one; hence the court's instructions on the inference did not violate the right of Turner to be convicted only on a finding of guilt

evidence against "major sources of supply, wholesale peddlers, interstate and international violators." Hearings on the Narcotic Rehabilitation Act of 1966 before a Special Subcommittee of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., 448 (1966) (hereinafter cited as 1966 Senate Hearings) (testimony of Commissioner Giordano of the Federal Bureau of Narcotics). The undisputed evidence that Turner possessed 275 glassine bags of heroin clearly shows that Turner was more than a mere user of heroin and was engaged in the distribution of the drug.

[31] See Task Force Report 3. See also 1955 Senate Hearings 3889, 4219.

[32] For example, a seizure of a large amount of pure heroin in Montreal, Canada, caused a "panic" in New York City that lasted almost three months. 1966 Senate Hearings 87.

[33] Such a conclusion is also justified with regard to those users and addicts who frequently purchase supplies of heroin on the retail market. Such persons are of course aware of the variations in price and availability of the drug and of the fact that the success of anti-smuggling efforts of law enforcement officials affects the supply of heroin on the market. See *supra,* this page and nn. 31, 32.

[34] See *Griego* v. *United States,* 298 F. 2d 845, 849 (C. A. 10th Cir. 1962).

beyond a reasonable doubt and did not place impermissible pressure upon him to testify in his own defense.[35] His conviction on Count 1 must be affirmed.

## III

Turning to the same § 174 presumption with respect to cocaine, we reach a contrary result. In *Erwing* v. *United States,* 323 F. 2d 674 (C. A. 9th Cir. 1963), a case involving a prosecution for dealing in cocaine, two experts had testified, one for the Government and one for the defense. It was apparent from the testimony that while it is illegal to import cocaine, coca leaves, from which cocaine is prepared, are legally imported for processing into cocaine to be used for medical purposes. There was no evidence that sizable amounts of cocaine are either legally imported or smuggled. The trial court instructed on the § 174 presumption and conviction followed, but the Court of Appeals for the Ninth Circuit reversed, finding the presumption insufficiently sound to permit conviction.

Supplementing the facts presented in *Erwing, supra,* the United States now asserts that substantial amounts of cocaine are smuggled into the United States. However, much more cocaine is lawfully produced in this country than is smuggled into this country.[36] The United States

---

[35] "The same situation might present itself if there were no statutory presumption and a *prima facie* case of concealment with knowledge of unlawful importation were made by the evidence. The necessity of an explanation by the accused would be quite as compelling in that case as in this; but the constraint upon him to give testimony would arise there, as it arises here, simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution." *Yee Hem* v. *United States,* 268 U. S. 178, 185 (1925).

[36] In 1966, 609 kilograms of cocaine were produced. U. S. Treasury Department, Bureau of Narcotics, Traffic in Opium and Other Dangerous Drugs, Report for the Year Ended December 31, 1967,

concedes that thefts from legal sources, though totaling considerably less than the total smuggled,[37] are still sufficiently large to make the § 174 presumption invalid as applied to Turner's possession of cocaine.[38]   Based on our own examination of the facts now before us, we reach the same conclusion.   Applying the more-likely-than-not standard employed in *Leary, supra,* we cannot be sufficiently sure either that the cocaine that Turner possessed came from abroad or that Turner must have known that it did.   The judgment on Count 3 must be reversed.[39]

## IV

26 U. S. C. § 4704 (a)[40] makes it unlawful to purchase, sell, dispense, or distribute a narcotic drug not in or from the original package bearing tax stamps.   In this case, Count 2 charged that Turner knowingly purchased, dispensed, and distributed heroin hydrochloride not in or

---

p. 42 (1968).   Annual seizures of cocaine at ports and borders for the years 1963 through 1967 ranged from 1.44 kilograms to 17.71 kilograms; the Bureau of Narcotics and Dangerous Drugs estimates that no more than about 10% of cocaine that is attempted to be smuggled into the United States is discovered and seized at ports and borders.   Brief for the United States 31 n. 31.

[37] From 1963 through 1968, the amount of cocaine stolen from legal channels annually ranged from 2.8 kilograms to 6.2 kilograms. Brief for the United States 44.

[38] Brief for the United States 28–32.

[39] Since the illegal possessor's only source of domestic cocaine is that which is stolen, the United States urges that the § 174 presumption may be valid with respect to sellers found with much larger amounts of cocaine than Turner had, amounts which, it is claimed, are too large to have been removed from legal channels and which must therefore have been smuggled.   Brief for the United States 31.   We find it unnecessary to deal with these problems and postpone their consideration to another day, hopefully until after the facts have been presented in an adversary context in the district courts.

[40] See *supra,* n. 2.

from the original stamped package.[41] Count 4 made
the identical charge with respect to cocaine. Section
4704 (a) also provides that the absence of appropriate
tax stamps shall be prima facie evidence of a violation
by the person in whose possession the drugs are found.
This provision was read by the trial judge to the jury.

The conviction on Count 2 with respect to heroin
must be affirmed. Since the only evidence of a viola-
tion involving heroin was Turner's possession of the
drug, the jury to convict must have believed this evi-
dence. But part and parcel of the possession evidence
and indivisibly linked with it, was the fact that Turner
possessed some 275 glassine bags of heroin without
revenue stamps attached. This evidence, without more,
solidly established that Turner's heroin was packaged to
supply individual demands and was in the process of
being distributed, an act barred by the statute. The
general rule is that when a jury returns a guilty
verdict on an indictment charging several acts in the
conjunctive, as Turner's indictment did, the verdict
stands if the evidence is sufficient with respect to any
one of the acts charged.[42] Here the evidence proved
Turner was distributing heroin. The status of the case
with respect to the other allegations is irrelevant to the

---

[41] The indictment charged Turner with *possessing* heroin as well
as purchasing, dispensing, and distributing the drug. The instruc-
tions to the jury made the same error. No objection was made in
the trial court and the issue was not raised in the Court of Appeals
or in this Court. The error was harmless in any event since the
possession evidence proved that Turner was distributing heroin. See
*infra,* this page.

[42] *Crain* v. *United States,* 162 U. S. 625, 634–636 (1896); *Smith*
v. *United States,* 234 F. 2d 385, 389–390 (C. A. 5th Cir. 1956);
*Price* v. *United States,* 150 F. 2d 283 (C. A. 5th Cir. 1945), cert.
denied, 326 U. S. 789 (1946). See also *Claassen* v. *United States,*
142 U. S. 140 (1891); *The Confiscation Cases,* 20 Wall. 92, 104
(1874).

validity of Turner's conviction. So, too, the instruction on the presumption is beside the point, since even if invalid, it was harmless error; the jury must have believed the possession evidence which in itself established a distribution barred by the statute.

Moreover, even if the evidence as to possession is viewed as not in itself proving that Turner was distributing heroin, his conviction must be affirmed. True, the statutory inference, which on this assumption would assume critical importance, could not be sustained insofar as it authorized an inference of dispensing or distributing (or of selling if that act had been charged), for the bare fact of possessing heroin is far short of sufficient evidence from which to infer any of these acts. Cf. *Tot* v. *United States,* 319 U. S. 463 (1943); *United States* v. *Romano,* 382 U. S. 136 (1965). But the inference of *purchasing* in or from an unstamped package is another matter.

Those possessing heroin have secured it from some source. The act of possessing is itself sufficient proof that the possessor has not received it in or from the original stamped package, since it is so extremely unlikely that a package containing heroin would ever be legally stamped. All heroin found in this country is illegally imported. Those handling narcotics must register; [43] registered persons do not deal in heroin and only registered importers and manufacturers are permitted to purchase stamps.[44] For heroin to be found in a stamped package, stamps would have to be stolen and fixed to the heroin container and even then the stamps would immunize the transactions in the drug only from prosecution under § 4704 (a); all other laws against transactions in heroin would be unaffected by the presence of the stamps.

---

[43] 26 U. S. C. §§ 4721, 4722. See also 26 U. S. C. § 4702 (a) (2) (C).

[44] 26 CFR §§ 151.130, 151.41.

There can thus be no reasonable doubt that one who possesses heroin did not obtain it from a stamped package.

Even so, obtaining heroin other than in the original stamped package is not a crime under § 4704 (a). Of the various ways of acquiring heroin, *e. g.*, by gift, theft, bailment or purchase, only purchasing is proscribed by the section. Since heroin is a high-priced product,[45] it would be very unreasonable to assume that any sizable number of possessors have not paid for it, one way or another. Perhaps a few acquire it by gift and some heroin undoubtedly is stolen, but most users may be presumed to purchase what they use. The same may be said for those who sell, dispense, or distribute the drug. There is no reasonable doubt that a possessor of heroin who has purchased it did not purchase the heroin in or from the original stamped package. We thus would sustain the conviction on Count 2 on the basis of a purchase not in or from a stamped package even if the evidence of packaging did not point unequivocally to the conclusion that Turner was distributing heroin not in a stamped package.

V

Finally, we consider the validity of the § 4704 (a) presumption with respect to cocaine. The evidence was that while in the custody of the police, Turner threw away a tinfoil package containing a mixture of cocaine and sugar, which, according to the Government, is not the form in which cocaine is distributed for medicinal purposes.[46] Unquestionably, possession was amply proved by the evidence, which the jury must have believed since it returned a verdict of guilty. But the

---

[45] Heroin is reported to sell for around $5 per "bag" or packet. Task Force Report 3.

[46] Brief for the United States 33.

evidence with respect to Turner's possession of cocaine does not so surely demonstrate that Turner was in the process of distributing this drug. Would the jury automatically and unequivocally know that Turner was distributing cocaine simply from the fact that he had 14.68 grams of a cocaine and sugar mixture? True, his possession of heroin proved that he was dealing in drugs, but having a small quantity of a cocaine and sugar mixture is itself consistent with Turner's possessing the cocaine not for sale but exclusively for his personal use.

Since Turner's possession of cocaine did not constitute an act of purchasing, dispensing, or distributing, the instruction on the statutory inference becomes critical. As in the case of heroin, bare possession of cocaine is an insufficient predicate for concluding that Turner was dispensing or distributing. As for the remaining possible violation, purchasing other than in or from the original stamped package, the presumption, valid as to heroin, is infirm as to cocaine.

While one can be confident that cocaine illegally manufactured from smuggled coca leaves or illegally imported after manufacturing would not appear in a stamped package at any time, cocaine, unlike heroin, is legally manufactured in this country;[47] and we have held that sufficient amounts of cocaine are stolen from legal channels to render invalid the inference authorized in § 174 that any cocaine possessed in the United States is smuggled cocaine. *Supra,* at 418–419. Similar reasoning undermines the § 4704 (a) presumption that a defendant's possession of unstamped cocaine is prima facie evidence that the drug was purchased not in or from the original stamped container. The thief who steals cocaine very probably obtains it in or from a stamped package. There is a reasonable possibility that Turner

[47] See *supra,* n. 36.

either stole the cocaine himself or obtained it from a stamped package in possession of the actual thief. The possibility is sufficiently real that a conviction resting on the § 4704 (a) presumption cannot be deemed a conviction based on sufficient evidence. To the extent that *Casey* v. *United States,* 276 U. S. 413 (1928), is read as giving general approval to the § 4704 (a) presumption, it is necessarily limited by our decision today. Turner's conviction on Count 4 must be reversed.

For the reasons stated above, we affirm the judgment of conviction as to Counts 1 and 2 and reverse the judgment of conviction as to Counts 3 and 4.

*It is so ordered.*

Mr. Justice Marshall, concurring in the judgment.

I concur in the judgment of the Court, affirming petitioner's conviction on Counts 1 and 2 and reversing his conviction on Counts 3 and 4. In so doing, however, I can agree with the majority on Count 2 only insofar as it concludes that evidence of possession of 275 glassine bags of heroin proved beyond a reasonable doubt that Turner was distributing heroin in violation of 26 U. S. C. § 4704 (a). That same evidence does not establish that he had *purchased* the heroin in violation of that statute.

The opinion of the Court establishes convincingly the virtual certainty that the heroin in Turner's possession had been illegally imported into the country. It was thus proper with regard to Count 1 for the trial judge to instruct the jurors in effect that if they found that Turner did indeed possess the drug, they could infer that the heroin had been illegally imported and impute knowledge of that fact to Turner. However, the instruction that possession is prima facie evidence of a violation of § 4704 (a) is quite different. It may be true that most persons who possess heroin have purchased it not in or from a stamped package. However, Turner

himself may well have obtained the heroin involved here in any of a number of ways—for example, by stealing it from another distributor, or by manufacturing or otherwise acquiring it abroad and smuggling it into this country. Given the dangers that are inherent in any statutory presumption or inference, some of which are set out in the dissenting opinion of MR. JUSTICE BLACK, I cannot agree with the wholly speculative and conjectural holding that because Turner possessed heroin he must have purchased it in violation of § 4704 (a).

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Few if any decisions of this Court have done more than this one today to undercut and destroy the due process safeguards the federal Bill of Rights specifically provides to protect defendants charged with crime in United States courts. Among the accused's Bill of Rights' guarantees that the Court today weakens are:

1. His right not to be compelled to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury;

2. The right to be informed of the nature and cause of the accusation against him;

3. The right not to be compelled to be a witness against himself;

4. The right not to be deprived of life, liberty, or property without due proess of law;

5. The right to be confronted with the witnesses against him;

6. The right to compulsory process for obtaining witnesses for his defense;

7. The right to counsel; and

8. The right to trial by an impartial jury.

The foregoing rights are among those that the Bill of Rights specifically spells out and that due process

requires that a defendant charged with crime must be accorded. The Framers of our Constitution and Bill of Rights were too wise, too pragmatic, and too familiar with tyranny to attempt to safeguard personal liberty with broad, flexible words and phrases like "fair trial," "fundamental decency," and "reasonableness." Such stretchy, rubberlike terms would have left judges constitutionally free to try people charged with crime under will-o'-the-wisp standards improvised by different judges for different defendants. Neither the Due Process Clause nor any other constitutional language vests any judge with such power. Our Constitution was not written in the sands to be washed away by each wave of new judges blown in by each successive political wind that brings new political administrations into temporary power. Rather, our Constitution was fashioned to perpetuate liberty and justice by marking clear, explicit, and lasting constitutional boundaries for trials. One need look no further than the language of that sacred document itself to be assured that defendants charged with crime are to be accorded due process of law—that is, they are to be tried as the Constitution and the laws passed pursuant to it prescribe and not under arbitrary procedures that a particular majority of sitting judges may see fit to label as "fair" or "decent." I wholly, completely, and permanently reject the so-called "activist" philosophy of some judges which leads them to construe our Constitution as meaning what they now think it should mean in the interest of "fairness and decency" as they see it. This case and the Court's holding in it illustrate the dangers inherent in such an "activist" philosophy.

Commercial traffic in deadly mind-, soul-, and body-destroying drugs is beyond doubt one of the greatest evils of our time. It cripples intellects, dwarfs bodies, paralyzes the progress of a substantial segment of

our society, and frequently makes hopeless and sometimes violent and murderous criminals of persons of all ages who become its victims. Such consequences call for the most vigorous laws to suppress the traffic as well as the most powerful efforts to put these vigorous laws into effect. Unfortunately, grave evils such as the narcotics traffic can too easily cause threats to our basic liberties by making attractive the adoption of constitutionally forbidden shortcuts that might suppress and blot out more quickly the unpopular and dangerous conduct. That is exactly the course I think the Court is sanctioning today. I shall now set out in more detail why I believe this to be true.

Count 1 of the indictment against Turner, as the Court's opinion asserts, and as I agree,

> "charged Turner with (1) knowingly receiving, concealing, and transporting heroin which (2) was illegally imported and which (3) he knew was illegally imported. . . . For conviction, it was necessary for the Government to prove each of these three elements of the crime to the satisfaction of the jury beyond a reasonable doubt." *Ante,* at 405.

The Court in the above statement is merely reaffirming the fundamental constitutional principle that the accused is presumed innocent until he is proved guilty and that the Government, before it can secure a conviction, must demonstrate to the jury beyond a reasonable doubt each essential element of the alleged offense. This basic principle is clearly reflected in several provisions of the Bill of Rights. The Fifth and Sixth Amendments provide that as a part of due process of law a person held for criminal prosecution shall be charged on a presentment or indictment of a grand jury and that the defendant shall "be informed of the nature and cause of the accusation." The purpose of these requirements

is obviously to compel the Government to state and define specifically what it must prove in order to convict the defendant so that he can intelligently prepare to defend himself on each of the essential elements of the charge. And to aid the accused in making his defense to the charges thus defined, the Bill of Rights provides the accused explicit guarantees—the privilege against self-incrimination, the right to counsel, the right to confront witnesses against him, and to call witnesses in his own behalf—all designed to assure that the jury will as nearly as humanly possible be able to consider fully all the evidence and determine the truth of every case.

Having invoked the above principles, however, the Court then proceeds to uphold Turner's conviction under Count 1 despite the fact that the prosecution introduced absolutely no evidence at trial on two of the three essential elements of the crime. To show this I think one need look no further than the Court's own opinion. The Court says:

> "The proof was that Turner had knowingly possessed heroin; since it is illegal to import heroin or to manufacture it here, he was also chargeable with knowing that his heroin had an illegal source. For all practical purposes, this was the Government's case." *Ante,* at 405.

> "Whatever course the jury took, it found Turner guilty beyond a reasonable doubt and the question on review is the sufficiency of the evidence, or more precisely, the soundness of inferring guilt from *proof of possession alone." Ante,* at 407. (Emphasis added.)

These passages show that the Government wholly failed to meet its burden of proof at trial on two of the elements Congress deemed essential to the crime it defined. The prosecution introduced *no* evidence to prove either

(1) that the heroin involved was illegally imported or (2) that Turner knew the heroin was illegally imported. The evidence showed only that Turner was found in possession of heroin.

I do not think a reviewing court should permit to stand a conviction as wholly lacking in evidentiary support as is Turner's conviction under Count 1. *Bozza* v. *United States,* 330 U. S. 160 (1947). See also *Thompson* v. *Louisville,* 362 U. S. 199 (1960). When the evidence of a crime is insufficient as a matter of law, as the evidence here plainly is, a reversal of the conviction is in accord with the historic principle that "independent trial judges and independent appellate judges have a most important place under our constitutional plan since they have power to set aside convictions." *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 19 (1955). I would therefore reverse Turner's conviction under Count 1 without further ado. Moreover, as the majority opinion and the record in this case indicate, petitioner's convictions under Counts 3 and 4 are also based upon totally insufficient evidence, for as in Count 1 the prosecution failed to introduce any evidence to support certain essential elements of the crimes charged under these counts. They, too, should be reversed for lack of evidence.

The Court attempts to take the stark nakedness of the evidence against Turner on these counts and clothe it in "presumptions" or "inferences" authorized by 21 U. S. C. § 174 and 26 U. S. C. § 4704 (a). Apparently the Court feels that the Government can be relieved of the constitutional burden of proving the essential elements of its case by a mere congressional declaration that certain evidence shall be deemed sufficient to convict. Such an idea seems to me to be totally at variance with what the Constitution requires. Congress can undoubtedly create crimes and define their elements, but it cannot under our Constitution even partially remove

from the prosecution the burden of proving at trial each of the elements it has defined. The fundamental right of the defendant to be presumed innocent is swept away to precisely the extent judges and juries rely upon the statutory presumptions of guilt found in 21 U. S. C. § 174 and 26 U. S. C. § 4704 (a). And each of the weapons given by the Bill of Rights to the criminal accused to defend his innocence—the right to counsel, the right to confront the witnesses against him and to subpoena witnesses in his favor, the privilege against self-incrimination—is nullified to the extent that the Government to secure a conviction does not have to introduce any evidence to support essential allegations of the indictment it has brought. It would be a senseless and stupid thing for the Constitution to take all these precautions to protect the accused from governmental abuses if the Government could by some sleight-of-hand trick with presumptions make nullities of those precautions. Such a result would completely frustrate the purpose of the Founders to establish a system of criminal justice in which the accused—even the poorest and most humble—would be able to protect himself from wrongful charges by a big and powerful government. It is little less than fantastic even to imagine that those who wrote our Constitution and the Bill of Rights intended to have a government that could create crimes of several separate and independent parts and then relieve the government of proving a portion of them. Of course, within certain broad limits it is not necessary for Congress to define a crime to include any particular set of elements. *But if it does*, constitutional due process requires the Government to prove each element beyond a reasonable doubt before it can convict the accused of the crime it deliberately and clearly defined. Turner's trial therefore reminds me more of Daniel being cast into the lion's den than it does of a constitutional proceeding. The Bible

tells us Daniel was saved by a miracle, but when this Court says its final word in this case today, we cannot expect a miracle to save petitioner Turner.

I would have more hesitation in setting aside these jury verdicts for insufficiency of the evidence were I confident that the jury had been allowed to make a free and unhampered determination of guilt or innocence as the jury trial provisions of Article III of the Constitution and the Sixth Amendment require. The right to trial by jury includes the right to have the jury and the jury alone find the facts of the case, including the crucial fact of guilt or innocence. See, *e. g., United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 15–19 (1955). This right to have the jury determine guilt or innocence necessarily includes the right to have that body decide whether the evidence presented at trial is sufficient to convict. Turner's convictions on each count were secured only after the jury had been explicitly instructed by the trial judge that proof of Turner's mere possession of heroin and cocaine "shall be deemed sufficient evidence to authorize conviction" under 21 U. S. C. § 174, and "shall be prima facie evidence of a violation" of 26 U. S. C. § 4704 (a). App. 15–18. In my view, these instructions to the jury impermissibly interfered with the defendant's Sixth Amendment right to have the jury determine when evidence is sufficient to justify a finding of guilt beyond a reasonable doubt.

The instructions directing the jury to presume guilt in this case were not, of course, the trial judge's own inspiration. Congress, in enacting the statutory presumptions purporting to define and limit the quantum of evidence necessary to convict, has injected its own views and controls into the guilt-determining, fact-finding process vested by our Constitution exclusively in the Judicial Branch of our Government. The Fifth Amendment's command that cases be tried according to due

process of law includes the accused's right to have his case tried by a judge and a jury in a court of law without legislative constraint or interference. These statutory presumptions clearly violate the command of that Amendment. Congress can declare a crime, but it must leave the trial of that crime to the courts. See *Leary* v. *United States,* 395 U. S. 6, 55 (1969) (concurring in result); and *United States* v. *Gainey,* 380 U. S. 63, 84–85 (1965) (dissenting opinion).

It is my belief that these statutory presumptions are totally unconstitutional for yet another reason, and it is a critically important one. As discussed earlier, the Constitution requires that the defendant in a criminal case be presumed innocent and it places the burden of proving guilt squarely on the Government. Statutory presumptions such as those involved in this case rob the defendant of at least part of his presumed innocence and cast upon him the burden of proving that he is not guilty. The presumption in 21 U. S. C. § 174 makes this shift in the burden of proof explicit. It provides that possession of narcotic drugs shall be deemed sufficient evidence to justify a conviction "unless the defendant explains the possession to the satisfaction of the jury." However, so far as robbing the defendant of his presumption of innocence is concerned, it makes no difference whether the statute explicitly says the defendant can rebut the presumption of guilt (as does the provision of 21 U. S. C. § 174 just quoted), or whether the statute simply uses the language of "prima facie case" and leaves implicit the possibility of the defendant's rebutting the presumption (as does 26 U. S. C. § 4704 (a)). Presumptions of both forms tend to coerce and compel the defendant into taking the witness stand in his own behalf, in clear violation of the accused's Fifth Amendment privilege against self-incrimination. This privilege has been consistently interpreted to establish

the defendant's absolute right not to testify at his own trial unless he freely chooses to do so. As we observed in *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964), the privilege is fulfilled only when the person is guaranteed "the right . . . to remain silent unless he chooses to speak in the unfettered exercise of his own will . . . ." The defendant's right to a free and unfettered choice in whether or not to testify is effectively destroyed by the coercive effect of the statutory presumptions found in 21 U. S. C. § 174 and 26 U. S. C. § 4704 (a). See *United States* v. *Gainey,* 380 U. S. 63, 71–74, 87 (1965) (dissenting opinions). Moreover, when the defendant declines to testify and the trial judge states to the jury as he did in this case that evidence of possession of narcotics shall be deemed sufficient to convict "unless the defendant explains the possession to the satisfaction of the jury," such an instruction is nothing less than judicial comment upon the defendant's failure to testify, a practice that we held violative of the Self-Incrimination Clause in *Griffin* v. *California,* 380 U. S. 609 (1965).

How does the Court respond to the grave constitutional problems raised by these presumptions of guilt? It says only that these presumptions are, in its view, "reasonable" or factually supportable "beyond a reasonable doubt." In other words, the Court has concluded that the presumptions are "fair" and apparently thinks that is a sufficient answer. It matters not to today's majority that the evidence that it cites to show the factual basis of the presumptions was never introduced at petitioner's trial, and that petitioner was never given an opportunity to confront before the jury the many expert witnesses now arrayed against him in the footnotes of the Court's opinion. Nor does it apparently matter to the Court that the fact-finding role it undertakes today is constitutionally vested not in this Court but in the jury. If Congress wants to make simple possession of

narcotics an offense, I believe it has power to do so. But this Court has no such constitutional power. Nor has Congress the power to relieve the prosecution of the burden of proving all the facts that it as a legislative body deems crucial to the offenses it creates.

For the reasons stated here, I would without hesitation reverse petitioner's convictions under Counts 1, 2, 3, and 4.