UNITED STATES of America,
Plaintiff–Appellee,

v.

Curtis Jordan HILL,
Defendant–Appellant.

No. 86–2860.

United States Court of Appeals,
Tenth Circuit.

Dec. 22, 1987.

David J. Phillips, Asst. Federal Public Defender (Charles D. Anderson, Federal Public Defender, with him on the brief), Kansas City, Kan., for defendant-appellant.

Robert S. Streepy, Asst. U.S. Atty. (Benjamin L. Burgess, Jr., U.S. Atty., with him on the brief), Kansas City, Kan., for plaintiff-appellee.

Before MOORE, McWILLIAMS, and BALDOCK, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Defendant Curtis Jordan Hill appeals his conviction for the crime of stealing property of the government, 18 U.S.C. § 641. The objects of the charged theft were money and an automobile belonging to the United States. With commendable candor, defendant acknowledges his dominion over this property may have been illegal, and perhaps even criminal, but he contends that even so, he could not be guilty of the offense charged as a matter of law. He argues that because he did not unlawfully come into possession of the property in the first instance, by definition his offense could not have been stealing. We agree and reverse.

In the summer of 1986, defendant approached agents of the Drug Enforcement Administration with an offer to aid them in their efforts to bring to ground drug dealers in Kansas City. He told them of his past dissolute life-style and his resolve to transform himself into a worthy citizen. As a vehicle to achieve this endeavor, he suggested he could trade upon his experience amidst drug purveyors to ferret out targets for the DEA.

Intrigued by this suggestion, the agents offered Mr. Hill an opportunity to prove his worth. After making clear that Mr. Hill would not become an agent of the government, the officers agreed to an arrangement whereby Mr. Hill would make drug buys and testify in exchange for compensation. Armed with that agreement and suitable instructions, Mr. Hill set out on his first venture.

As luck would have it though, Mr. Hill did not artfully conclude the transaction

which ensued. The details of the misadventure are not important here; therefore, suffice it that Mr. Hill was given $600 with which he purchased cocaine from the spouse of a known dealer. To his misfortune, however, the dealer later accused Mr. Hill of stealing more cocaine from him. Because of his resultant discomfiture, Mr. Hill removed himself to another city to await the return of serenity.

At the urging of one of the agents, Mr. Hill agreed to come back to Kansas City and make one more purchase to seal the government's case against the dealer. After considering the proposition, Mr. Hill called the agents and told them he agreed. He further stated he had contacted the dealer and resolved matters with him. All Mr. Hill had to do was pay the dealer $800 to exonerate a debt he owed the dealer, and Mr. Hill could make another purchase. With the consent of the agents, Mr. Hill arranged to buy one ounce of cocaine for $2,000. It was planned that after the purchase agents would execute a search warrant and arrest the dealer.

Mr. Hill flew to Kansas City and was met by agents at the airport to finalize plans for the buy. During the course of conversation, consideration was given to the means by which Mr. Hill was going to drive to the dealer's location. After some discussion, it was agreed that it would look better if Mr. Hill drove alone. Since Mr. Hill had no car of his own, the agents also decided Mr. Hill should drive the car assigned to one of them. In addition, they gave Mr. Hill $2,800 to pay his "debt" and to purchase the ounce of cocaine, together with an additional $600 as a fee for his service and reimbursement for his expenses. Mr. Hill was then told that after he made his purchase, he was to meet with the agents so they could field test the substance he bought.

Once again Mr. Hill set sail to encounter the denizens of the drug world, but his voyage was not consummated as planned. Despite strict orders to drive slowly and not to go through yellow lights, Mr. Hill chose a different course. Indeed, with seeming abandon, he sped through several yellow lights and then disappeared over the crest of a hill, leaving the trailing agents grounded upon the shoals of a red light. Although the agents tried to find Mr. Hill, their efforts were in vain, and the search was abandoned.

The following day, the government's car was discovered in a parking lot across from the University of Kansas Medical Center. Neither Mr. Hill nor the "buy money" were to be found. Four days later, however, after an apparent lost weekend, Mr. Hill appeared at DEA headquarters and surrendered himself. He was arrested on the spot.

While it does not affect the legal analysis of the case, it does complete the saga to disclose at trial Mr. Hill explained that while driving to the assignation with the dealer, he thought of what might take place and the uncertainty of his safety; consequently, he panicked and bolted out of fear. He added that because he was suffering from a toothache, he went to a dentist at the University of Kansas Medical Center where he left the car. While he could not account for the majority of the missing money, he did admit to spending some of it on drugs for his own use.

The issue here, in light of these facts, is whether the evidence supported the charge. More particularly, the question is whether Mr. Hill "stole" the government's property as that term is used in § 641.

The statute upon which the charge against Mr. Hill was based states:

Whoever embezzles, *steals*, purloins, or knowingly converts to his use ... any ... money, or thing of value of the United States ... shall be fined ... or imprisoned....

18 U.S.C. § 641 (emphasis added). Mr. Hill argues that while he might have been guilty of illegal conversion, because the agents willingly gave him possession of the money and the car, he could not be guilty of stealing.

The critical evidence is not in dispute. First, the decision to give Mr. Hill the money was solely that of the agents. Obviously, without the money Mr. Hill could not have effected the proposed drug transac-

tion. Second, it was only after rational discussion that the agents decided to let Mr. Hill have the car.

The agent in principal charge of the case testified:

We discussed whether or not I should drive him [Mr. Hill] out there and wait in the parking lot, whether or not I should drive him out there and drop him off and then pick him up later, or whether or not he should use the car. It wasn't mandatory, all three of those things were acceptable, but we felt at first, by all of us, myself and Dave Cigich [another agent] and Mr. Hill—as we talked more about that, Mr. Hill made the suggestion it would be easier if he drove because of the fact that certain times Mr. Walters [the dealer] would come out of the building, walk him to the car, and obviously if he didn't have a car there and he knew someone was picking him up, that would make Mr. Walters paranoid....

. . . .

We from time to time provided automobiles ... to informants for the use in negotiations and use of undercover work. It's basically used on a case-by-case basis. The point is Mr. Hill didn't beg to use the automobile. He thought it was a good idea, that it would enhance the case, and the fact that we would have— there would be no difficulty if Mr. Walters walked out with him, he wouldn't have to make excuses.

When asked by the prosecutor whether he allowed Mr. Hill to use the car "to protect the integrity of [the] investigation", the agent responded affirmatively. Thus, even though the reason for letting Mr. Hill use the car was supplied by him, there was no suggestion that the reason was false, and the decision to do so was made by the agents for their own purposes.

There is no evidence, either direct or circumstantial, which suggests the decisions to give Mr. Hill the money or the car were the product of Mr. Hill's urging or chicanery or that at the time the decisions were made, Mr. Hill did not intend to go through with the transaction.[1] The only evidence of criminality is the circumstantial evidence devolving from the conduct of Mr. Hill *after* he acquired possession of the property.

Looking at the evidence in the light most favorable to the government, it is inferable that when Mr. Hill started to pull away from the agents, he wanted to evade them. This conduct supports an inference that Mr. Hill intended at that time to do something with the property other than what had been agreed upon. Mr. Hill's testimony adds the circumstance that while he intended to go through with the transaction when he received possession of the money and the car, he changed his mind afterward. This change of heart is unrefuted by any other evidence.

In the face of this evidence, the trial court instructed the jury that to "steal" means to "*take away* [property] from one in lawful possession *without right.*" (Emphasis added.)[2] It is upon this foundation

---

**1.** In his dissent, Judge McWilliams suggests in the defendant's testimony there is evidence that could have led the jury to believe Mr. Hill obtained the money and the car by fraudulent means, thereby providing sufficient evidence of guilt. It is hypothesized that one who obtains possession by fraudulent means is guilty of stealing. Yet, the theory is inapposite because the jury was not instructed that it could consider fraud as a means of taking. *See infra* n. 3. Additionally, while defendant stated he became "apprehensive" about the transaction while in the DEA office, the inference that he did not at that time intend to go through with the deal does not follow. Indeed, the evidence is to the contrary because Mr. Hill also stated his apprehension did not deter him at that time.

**2.** The operative portion of the instruction states:

The essential elements required to be proved in order to establish the offense charged in the Indictment are:
*FIRST:* That the money and property described in the Indictment belonged to the United States or an agency thereof, and had a value in excess of $100.00 at the time alleged;
*SECOND:* That the defendant stole such money and property; and
*THIRD:* that the defendant did so with the intent to deprive the owner, either temporarily or permanently, of the use or benefit of the money and property taken.
No other definition of the elements of proof was given to the jury. In particular, the jury was not instructed on the use of fraud, trick, chicanery, or other subterfuge to effect the taking necessary to constitute the crime of stealing. Furthermore, the jury was instructed it could

that defendant fashioned his defense and his argument in this court that he had a lawful right to the property up to the moment he decided to apply it to a use not agreed upon by the agents. The government has no persuasive rebuttal to this argument.

■ The government's initial line of defense is that the jury was incorrectly instructed. The prosecution first takes the Supreme Court to task for its definition of the verb "to steal" in *Morissette v. United States*, 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952): "to steal means to take away from one in lawful possession without right with the intention to keep wrongfully." [3] Although the government rails against this definition, it has not been overruled. Consequently, there is no doubt of the validity of the instruction.[4]

The government then focuses upon the breadth of the crime defined in § 641 and argues that stealing is an offense not to be circumscribed by the narrow concepts of the common law. The argument is sound in the abstract but bereft of application to this case.

The government fails to recognize that while § 641 defines a broad crime against property, *Findley v. United States*, 362 F.2d 921 (10th Cir.1966), it nonetheless circumscribes the means by which that crime can be committed. Thus, even though the nature of the crime is vast in scope, it is subject to statutory delineations with internal demarcations of proof which cannot be blurred. Although § 641 was broadly written, historical considerations persuaded Congress to distinguish between the different ways in which the crime could be committed.

■ At common law, larceny was a crime against property characterized by a felonious taking and carrying away of belongings of another with an intent to steal. 50 Am.Jur.2d *Larceny* § 2 (1970). Later codifications of the offense broadened its definition to include acts amounting to embezzlement, taking by false pretenses, and a myriad of other trespasses in between. *Id.* Evidentiary problems frequently arose because of the fine distinctions between the elements of each of these offenses. *See Morissette*, 342 U.S. at 272, 72 S.Ct. at 254–55. Therefore, Congress attempted to eliminate many of these problems by codifying as one crime with wide parameters trespass to property of the government. In doing so, however, Congress nonetheless delineated separate means by which the offense could be committed. *Id.* Hence, the elements of embezzlement, stealing, and conversion were preserved in § 641 as alternate means of committing the statutory offense therein defined. Yet, by including all of those means within the definition of one offense, Congress did not intend those means to be interchangeable. Interchangeability would eliminate any reason for separately enumerating the different and distinguishable means by which the crime can be accomplished.

■ The government argues, however, that the concept of stealing includes "all felonious takings with intent to deprive the owner of rights and title," *citing United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957).[5] That argument begs the issue, however, because the problem with which we are concerned is not whether "stealing" in the abstract is considered an all inclusive act, but whether in the context of § 641 it is universally inclusive or a circumscribed means of committing a

"consider only whether the defendant has or has not committed the *acts charged in the Indictment.*" (Instruction 11, emphasis added.)

**3.** This definition was the source of the trial court's instruction.

**4.** Likewise, we are not impressed by the government's argument that the defendant's proposal of the instruction was untimely. The purpose of instructions is to inform the jury of the law it must apply to the facts that it finds. This pur-

pose is not to be subverted merely because defense counsel proffers an instruction for the first time during trial.

**5.** The question in *Turley* was whether an automobile taken from its owner by means of a crime other than common-law larceny was "stolen" within the meaning of the Dyer Act. The case is not apposite here, even though the Court answered the question affirmatively.

particular statutory offense.[6] The question may be framed in another way: Can a conviction for violating § 641 be sustained when the indictment charges the offense was committed by means of stealing only and the evidence proves another means was employed? The answer must be "No."

■ The problem here is not that the acts of the defendant were beyond the scope of § 641, but that they had no relation to the means by which the government accused the defendant of having taken its property.[7] Contrary to the position seemingly urged by the government, proof that the defendant *converted* property of the government is not proof that he *stole* it. The concepts of stealing and conversion are mutually exclusive. *Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254. *See also Marteney v. United States*, 218 F.2d 258, 262 (10th Cir.1954), *cert. denied*, 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745 (1955).

■ For that reason, in the context of the indictment and the instructions, it does not matter when the defendant formed the intent to exercise dominion over the property before or after he left the DEA office. The evidence is unrefuted that the agents wilfully parted with the property, thus the type of taking necessary to support a charge of stealing is not present here. Even using the government's theory of when Mr. Hill formed the intent to deprive the government of its property, the offense could not be stealing because he did not exercise dominion over the property until after it rightfully came into his possession.

■ The distinction between stealing and conversion turns on how possession is obtained. One who gains possession of property by wrongfully taking it from another steals. *Morissette*, 342 U.S. at 271, 72 S.Ct. at 254. One who comes into possession of property by lawful means, but afterwards wrongfully exercises dominion over that property against the rights of the true owner, commits conversion. *Morissette*, 342 U.S. at 272, 72 S.Ct. at 254; *United States v. May*, 625 F.2d 186, 192 (8th Cir.1980) (quoting Restatement (Second) of Torts § 228). There is no way in which both offenses can be committed by the same person involving the same property at the same time for the simple reason that one cannot wrongfully take property and still come into possession of it in a lawful manner. Yet, that is the essence of the government's argument.

The government could have charged the § 641 offense in the conjunctive, *see Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), but it did not do so. Having formed the charge in a limited way, the government cannot now complain that the charge must be dismissed because the evidence demonstrates the wrong choice was made.

REVERSED.

McWILLIAMS, Circuit Judge, dissenting:

I respectfully dissent. Hill was charged with a violation of 18 U.S.C. § 641. That statute reads, in part, as follows:

**6.** In a different context, we have said a fraudulent taking constituted stealing within the meaning of a statute prohibiting the taking of property of a bank with intent to steal. *United States v. Shoels*, 685 F.2d 379 (10th Cir.1982), *cert. denied*, 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983). In that case, we said the statutory offense of stealing in 18 U.S.C. § 2113(b) was to be given a meaning beyond the common-law crime of larceny, but the statutory crime did not include the mutually exclusive means of committing the offense found in § 641. Therefore, the problem we faced in *Shoels* was different from that posed in this case.

**7.** If it was the government's theory that the stealing was accomplished by fraud, it should have proffered an instruction to that effect. On appeal, a conviction cannot be sustained on a theory upon which the jury was not instructed. *Chiarella v. United States*, 445 U.S. 222, 237, 100 S.Ct. 1108, 1119, 63 L.Ed.2d 348 (1980); *United States v. Porter*, 591 F.2d 1048, f.n. 6 (5th Cir. 1979). Even though the prosecutor argued his theory to the jury, in the absence of an instruction permitting consideration of that theory, we can only speculate upon what inferences the jury might have drawn. Such speculation, under the circumstances of this case, is improper. *Cola v. Reardon*, 787 F.2d 681 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986). Moreover, judging from the government's objections to the definition of stealing voiced to the trial court, it is evident that the prosecution's fraud theory was an afterthought.

641. *Public money, property or records.* Whoever embezzles, steals, purloins or knowingly converts to his use or the use of another, ... any record, voucher, money, or thing of value of the United States or of any department or agency thereof ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Specifically, the charge against Hill in a one count indictment was that he "did unlawfully steal money in the amount of three thousand and one hundred dollars ($3,100.00) and a 1985 Chevrolet Camero automobile ..., a thing of value of more than $100.00, both property of the Drug Enforcement Administration, an agency of the United States, in violation of Title 18, United States Code, Section 641."

The jury was instructed that "to 'steal' means to take away from one in lawful possession without right and with the intent to deprive the owner, either temporarily or permanently of the use or benefit of that property." This instruction was based on language appearing in *Morissette v. United States*, 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952), which language was itself based, in turn, on language in *Irving Trust Co. v. Leff*, 171 N.E. 569, 571 (N.Y.Ct. of App.1930). We note, parenthetically, that *Irving Trust* was a civil case, not a criminal case. *Morissette*, however, was a criminal case and involves a consideration of the same statute with which we are here concerned.

The portion of § 641 here involved declares that "[w]hoever [1] embezzles, [2] steals, [3] purloins, [4] or knowingly converts to his own use ... money or thing of value of the United States or any department or agency thereof ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both" if the value of such property exceeds $100.00.[1] In *Morissette*, the charge was that the defendant did unlawfully "steal and convert" property of the United States. The defendant was convicted in the district court, and

the jury in that case was instructed that a so-called "criminal intent" was not an essential element of the crime charged. The Circuit Court upheld the defendant's conviction, but the Supreme Court, on certiorari, reversed. The Supreme Court held that even though "criminal intent" is not mentioned in § 641, it is an essential element of all four ways set forth above for violating the statute. In *Morissette*, the particular issue was whether a "criminal intent" was an essential element of the fourth way of violating the statute, i.e., "knowingly converts," which the Supreme Court said it was. The Supreme Court in that case also observed that "there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute."

My basic disagreement with the majority opinion is that it holds as *a matter of law* that Hill came into possession of the money and automobile *lawfully*. In my view of the record the evidence is such as to *permit* the jury, as the fact finder, to find that Hill came into possession of the money and automobile by fraud, deception, misrepresentation, trickery, and chicanery, in which event Hill would not have come into possession of the money and automobile in a lawful manner.

When one gives property to another for a specific purpose, and the receiving party *immediately upon receipt* thereof converts the property to his own use, one inference, and I suggest a fair inference, is that the receiving party never did intend to fulfill the purpose for which the property was given, and, by pretending that he would, he induced the owner of the property to part company with his property. In the instant case, Hill got possession of the money and automobile for the purpose of proceeding to a residential home where he was to make a "drug buy," and, after getting the money and the vehicle, he at once "took-off," running red lights and "shaking" the agents who were following in a second vehicle. Hill later abandoned

---

**1.** Obtaining property of the United States by fraud, deception, misrepresentation, trickery, or chicanery is *not* one of the alternate ways mentioned in § 641 whereby one can violate the statute.

the automobile, took a taxi to a downtown hotel and used the government's money, or part of it, to buy cocaine for his personal consumption. A couple of days later, Hill "surrendered," apparently at the insistence of his sister. The automobile was recovered, but all the money was missing.

Further, at trial, Hill testified, on cross examination, that before he received the money and the keys to the automobile he began to be "concerned" about the success of the scheme. Also, one of the drug agents testified that it was Hill's "suggestion" that he (Hill) be allowed to drive to the scene of the proposed drug purchase by himself, whereas the drug agents testified that ordinarily they would drive an informant to the scene of a drug sale.

The argument that Hill obtained the money and vehicle by deception, intending to appropriate both to his own use, was made by the government to the jury and I believe it to be a plausible argument supported by the record. And defense counsel argued quite vigorously the converse to the jury, i.e., that Hill received the money and automobile lawfully and without criminal intent, and therefore, under the district court's instruction that "to 'steal' means to take away from one in lawful possession without right ...", he could not have "stolen" the items.

The majority opinion suggests that the jury was not adequately instructed on this particular matter. Be that as it may, on appeal, defense counsel makes no challenge to any instruction, nor does he claim that the jury should have been more fully instructed on any matter. On appeal, counsel's only argument is that, on the record as made, Hill, as a matter of law, came into possession of the money and automobile lawfully. With this I cannot agree. That issue was for the jury to decide.[2]

2. In support of my belief that one who obtains property of another through fraud, deception, or chicanery with an intent to convert the same to his own use and feloniously converts it to his own use, "steals," see *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957);

*United States v. Shoels*, 685 F.2d 379 (10th Cir. 1982); *Loney v. United States*, 151 F.2d 1 (10th Cir.1945). Compare with *Hite v. United States*, 168 F.2d 973 (10th Cir.1948). In *Shoels* we said the reasoning in *Hite* was rejected by the Supreme Court in *Turley*.