**UNITED STATES of America, Plaintiff,**

v.

**Harold JOHNSON, Defendant.**

**No. 88 CR 721.**

United States District Court,
N.D. Illinois, E.D.

Nov. 3, 1989.

Therese Cesar–Garza, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

June Fournier, Chicago, Ill., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

After this Court had ruled on all pending motions and had set this case for trial, counsel for defendant Harold Johnson ("Johnson") and the government advised this Court that agreement had been reached to conduct the trial as a stipulated bench trial. Having then conducted the appropriate extended inquiry on the waivers required for that purpose, this Court finds that Johnson has knowingly and voluntarily waived his constitutional rights:

1. to a jury trial,

2. to cross-examination of the witnesses whose testimony would be needed to provide the trier of fact with the evidence referred to in (a) Stipulation No. 1 as to Johnson's fingerprint, (b) Stipulation No. 2 as to Johnson's handwriting and (c) the stipulations as to what would be the testimony of United States Postal Service employees Jimmie Williams ("Williams") and Martha Fletcher ("Fletcher") and United States Postal Inspector C.M. Gause ("Gause") and

3. to the presentation of Johnson's testimony on his own behalf.

Accordingly Johnson's trial on the one-count indictment in this case has been conducted as a bench trial based on the stipulations that form the agreed-upon record in the case.

Johnson is charged with a violation of 18 U.S.C. § 500 ("Section 500"). To sustain that charge the United States must prove beyond a reasonable doubt that Johnson knowingly converted to his own use a blank money order provided by the United States Postal Service. In each instance the following findings by this Court reflect its determinations as to what the evidence has established beyond a reasonable doubt.

### Findings of Fact

United States Postal Service Money Order No. 30201571574 (the "Money Order") was stolen from the Haymarket Postal Station, 168 West Clinton Street, Chicago, Illinois in an armed robbery at about 1:55 p.m. August 22, 1988.[1] Just over two hours later Johnson appeared at another postal station (the Midwest Postal Station, 3045 West Washington Boulevard, Chicago, Illinois) and presented the Money Order to Williams for payment, exhibiting two identification documents of his own. Johnson had filled in the blanks on the Money Order in his own handwriting, and his fingerprint appears on the Money Order.

Williams recognized the Money Order as a "bait money order"[2] and reported it to his supervisor. Under instructions from the supervisor, Williams then asked Johnson to wait. While Johnson was waiting he asked Williams if the Money Order was "good" and then added that he knew it was because his brother had sent it to him from somewhere in Illinois. Although Williams is unable to recall the location in Illinois to which Johnson referred, Williams does remember that the stated location was *not* in Chicago.

Williams then observed Johnson walk away from his window and confer with an unknown male in the customer area of the postal station. After that Johnson returned to Williams' window and demanded the return of the Money Order. When Williams assured him that it would be only a few more minutes, Johnson walked away from the window and left the postal station—leaving behind him the Money Order and his Illinois Department of Public Aid photo identification card (one of the two identification pieces he had exhibited)—without saying anything more to anyone in the postal station.

One year later Johnson was arrested in connection with the investigation of the armed robbery. At that time his statement to Postal Inspector Gause was that he had found the Money Order on the curb of the sidewalk outside a McDonald's Restaurant that was not too far from his own residence or from the Midwest Postal Station. It is also worth noting[3] that the McDonald's Restaurant to which Johnson referred was about 2.5 miles from the place where the Money Order had been stolen (the Haymarket Postal Station) and that Johnson's story was that he had found the Money Order "possibly around 1:00 p.m."—an hour *before* the robbery at the postal station.

### Conclusions of Law

In relevant part Section 500 reads:

Whoever embezzles, steals, or knowingly converts to his own use or to the use of another, or without authority converts or disposes of any blank money order form provided by or under the authority of the Post Office Department or Postal Service

\*   \*   \*   \*   \*   \*

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

*Morissette v. United States*, 342 U.S. 246, 270–73, 72 S.Ct. 240, 253–55, 96 L.Ed. 288 (1952) confirmed the common law notion that proof of conversion requires nothing more than proof that the defendant exercised dominion over property belonging to another party so as to interfere substantially with the owner's right to control the use

---

1. No inference is drawn here—nor is any called for beyond a reasonable doubt by the stipulated facts in this case—as to Johnson's having been involved in the armed robbery. Instead the uncontroverted fact that the Money Order was stolen from the Postal Service, especially when coupled with Johnson's two inconsistent stories as to how he came into possession of the Money Order—one given when he presented it for payment and the other given a year later at the time of his arrest—tends to confirm two material conclusions that *are* established beyond a reasonable doubt: that Johnson was not the owner

of the Money Order when he converted it, and also that the conversion was a knowing one.

2. "Bait money order" is the term employed to describe one used for the purpose of tracking suspects and money orders stolen during thefts or robberies.

3. Even though neither of the factors mentioned in this sentence weighs heavily in the ultimate determination, they serve as additional underpinning for the conclusions expressed here.

of that property. *United States v. Hill,* 835 F.2d 759, 764 (10th Cir.1987) pushed that concept a good deal farther by coupling the asserted principle that "[t]he concepts of stealing and conversion are mutually exclusive" with the following elaboration:

> The distinction between stealing and conversion turns on how possession is obtained. One who gains possession of property by wrongfully taking it from another steals. *Morissette,* 342 U.S. at 271, 72 S.Ct. at 254. One who comes into possession of property by lawful means, but afterwards wrongfully exercises dominion over that property against the rights of the true owner, commits conversion. *Morissette,* 342 U.S. at 272, 72 S.Ct. at 254; *United States v. May,* 625 F.2d 186, 192 (8th Cir.1980) (quoting Restatement (Second) of Torts § 228). There is no way in which both offenses can be committed by the same person involving the same property at the same time for the simple reason that one cannot wrongfully take property and still come into possession of it in a lawful manner.

In candor, *Morissette* really does not bear the reading given it in *Hill.* Perhaps the best clue to the inaccuracy of *Hill*'s characterization of stealing and conversion as "mutually exclusive" is the language of *Morissette* itself at the very pages cited by *Hill* for its "mutually exclusive" reading (342 U.S. at 271–72, 72 S.Ct. at 254, emphasis added):

> It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped

through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. *Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing.* "To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully.*" (Italics added.) *Irving Trust Co. v. Leff,* 253 N.Y. 359, 364, 171 N.E. 569, 571. Conversion, however, *may* be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful.

And see also the statutes cited in *Morissette, id.* 342 U.S. at 272 nn. 32 and 33, 72 S.Ct. at 254 nn. 32 and 33, which the Supreme Court there characterizes as paralleling Congress' intent.

■ All of that reflects the common law concept that the *lawful* acquisition of possession is not a *defense* to a charge of conversion—but that does not at all mean that the *unlawful* acquisition of possession *negates* conversion (else what is to be made of the *Morissette* statement that "[p]robably every stealing is a conversion"?). On the contrary, the knowing exercise of dominion over another's property by stealing it from that person, though the possession is wrongful in the inception, is just as much a conversion as is the knowing wrongful exercise of dominion over property after a lawfully-obtained possession.

■ Whether or not the *Hill* gloss on *Morissette* is persuasive (as this Court finds it is not), Johnson must be convicted here.[4] There is no question in any event

---

4. Indeed, whatever may be said in this respect, what *is* clear in any case is that the argument advanced on Johnson's behalf is flat-out wrong. Johnson Mem. 2 asserts under the caption "THE GOVERNMENT HAS FAILED TO PROVE AN ESSENTIAL ELEMENT OF THE OFFENSE CHARGED":

> The Government has failed to prove that Mr. Johnson participated in the robbery of the Haymarket Station.

But in no event is participation in the robbery an essential component of a conversion charge:

> 1. If *Hill* were right, participation in the robbery could negate, rather than going to prove, conversion.

that the Money Order was not his property. There is also no question that his filling in the blanks to provide for its payment to him and then his attempting to exchange it for cash met the test of wrongful exercise of dominion over the Money Order. Two alternatives then present themselves:

1. If the *Hill* analysis is unpersuasive, so that conversion is not negated as a definitional matter by stealing, Johnson converted the Money Order whether or not he was involved in the theft. In all events his conduct just described in this paragraph constituted a conversion in the legal sense.

2. If *Hill* is instead correct in its bright-line statement—if conversion does require the original possession to have been obtained lawfully—Johnson is still the loser, because the government has advanced (and can advance) nothing that would support a finding of his having stolen the Money Order. On the facts before this Court Johnson's own story that he *found* the Money Order may be credited, and a finder of lost property takes possession of that property in the first instance in a lawful manner. It is the *later* exercise of dominion in the manner already described that constitutes the prohibited conversion.

Finally, there is no question on the facts before this Court that the conversion by Johnson was *knowing*. No discussion is really required on that score.

That is enough to compel the ultimate conclusion that Johnson is guilty beyond a reasonable doubt. But two other issues raised by Johnson's able appointed counsel—both false issues (like that discussed in n. 4) despite counsel's able and good faith presentation—bear brief attention.

■ First, counsel wanders off the reservation by focusing (Mem. 3–5) on the government's "fail[ure] to prove that Mr. Johnson knew the stolen, embezzled or converted nature of 'the blank money order' at the time he possessed it" (*id.* at 3) or "at the time of presentment" (*id.* at 5). Those

characterizations focus incorrectly on the status of the Money Order *before* Johnson himself committed the indubitable act of conversion. Johnson's relevant knowledge is the fact that at the time he himself converted the Money Order by exercising dominion over it, he knew he was doing so wrongfully with respect to someone else's property.

■ Second, in accordance with regular prosecutorial drafting habits, Johnson's indictment departs from the statutory language of Section 500 in its use of conjunctions. Here is how the indictment reads (emphasis added):

> The SPECIAL APRIL 1987 GRAND JURY charges:
>
> On or about August 22, 1988, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division,

### HAROLD G. JOHNSON,

> defendant herein, embezzled, stole *and* knowingly converted to his own use *and* to the use of others, *and* without authority converted *and* disposed of a blank money order form provided by and under the authority of the United States Post Office Department and United States Postal Service, namely, United States of America Postal Money Order form number 30201571574;
>
> In violation of Title 18, United States Code, Section 500.

As Johnson Mem. 6–8 would have it, those charges represent a material variance from the proof because there is no showing of conversion "to the use of others." But that is purely and simply a red herring, for it is conventional wisdom that crimes may be charged in the conjunctive but proved in the disjunctive. As *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970) (footnote and citations omitted) put it:

> The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive,

---

2. If this Court's reading of *Morissette* is correct, Johnson's participation or nonparticipation in the robbery is an irrelevancy, given his later exercise of dominion over (that is, his conversion of) the Money Order.

as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged.

And see this Court's opinion in *United States v. Yonan*, 622 F.Supp. 721, 727 n. 8 (N.D.Ill.1985), one of the myriad cases stating and applying the same principle (*Yonan* cites to 1 Wright, *Federal Practice and Procedure: Criminal 2d* § 125, at 373 (1982)), which not only lists many of the other cases so holding but also explains why the practice is such a popular one: It avoids a trap for the draftsman who follows the statutory disjunctive language and thus unthinkingly produces an insufficient indictment [5]).

In sum, the government has proved Johnson guilty beyond a reasonable doubt of having illegally converted the Money Order as charged in the indictment. This Court so finds and concludes.

---

[5]. In fact, that is precisely the trap that the government fell into in *Hill* by *failing* to charge the offense in the conjunctive, thus causing the reversal of the defendant's conviction (835 F.2d at 764).