# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-17-00734-CR

---

**Endicott McCray, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 147TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-DC-16-301466, THE HONORABLE CLIFFORD A. BROWN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Endicott McCray guilty of first-degree murder and found that he should be sentenced to sixty-five years in prison. On appeal, appellant argues that the evidence is insufficient to prove that he fired the fatal shots or that he shot into a crowd of people. We will affirm the trial court's judgment of conviction.

### SUMMARY OF THE EVIDENCE[1]

In July 2016, Sabrina and Teqnika Moultrie visited family in Austin. At about 2:00 a.m. on July 31, they were walking away from Voodoo Doughnuts in the 6th Street entertainment district when they heard gunshots. Five people, including Teqnika, were shot. Teqnika died on the scene, and three people required hospital treatment for their wounds.

---

[1] We will summarize the evidence presented to the jury only to the extent necessary to determine appellant's issues.

Austin Police Officers Thomas Childress and Luke Werner testified that 6th Street and Voodoo Doughnuts are usually crowded that time of night as patrons leave the bars as they close. Werner remembered that the night of the shooting was "extremely busy. Essentially it was sidewalk to sidewalk, shoulder to shoulder." Sabrina's brother-in-law confirmed that both the donut shop and the street were crowded with people, testifying that the group waited in line for "a tremendously long time" at Voodoo Doughnuts and had just left to find their ride home when Teqnika was shot. Childress testified that at about 2:00 a.m., he and his partner were near Voodoo Doughnuts "breaking up a fight of about 15 people." They were pushing people away and telling them to leave the area when Childress heard four gunshots "fairly close in proximity" to where he was standing, at which point "everybody scattered" and started running away.

Christopher Walker is appellant's brother-in-law. He testified that on the night in question, he went to 6th Street with his then-girlfriend, Latoya Walker, and some other friends. He saw appellant and walked over to ask why appellant had not gone to appellant's daughter's birthday party, which had upset Shante, appellant's wife and Walker's sister. Walker said that he "was upset" with appellant but that he and appellant did not raise their voices or get argumentative. Walker got nervous that appellant might have a weapon because he saw appellant "fidgeting at his waistband" and shoved appellant out of fear and to try "to get him further away." Walker never saw appellant with a gun in his hand, but when he was asked whether he "saw the print or kind of the outline of gun in the pants" appellant was wearing, he said, "Yeah, I seen a print," explaining that the "print" was on the side of his waistband where appellant was fidgeting. When Walker shoved appellant, appellant fell backwards but did not lose his footing. Walker backed up and ran, falling at one point, and explained that he ran because he was scared "[o]f getting shot" and that he heard four or five gunshots. Walker ran

2

until the gunshots stopped, and when he stopped running, he saw "a lot of people crying, yelling" and "some people laying down dead like they had been shot." Walker testified that he was wearing a red shirt and a red baseball hat and that he did not remember what appellant was wearing, whether appellant's shoulder-length dreadlocks were down or pulled back into a ponytail, or whether appellant was wearing a hat. Walker called the police to tell them what had happened after the police contacted his family for information.

Latoya Walker testified that just before the shooting, she saw Walker and appellant standing face to face talking. She was not close enough to hear their words and said they were not yelling. Latoya had her back to them while she talked to her friends until she heard something that made her turn around. Although she did not see Walker push or hit appellant, she saw appellant "just kind of moved back" and then saw appellant pull a gun from his waistband. Latoya said that the gun appeared to get stuck on appellant's pants or belt for a second "and that's when the first shot went off and hit the ground." "Everybody started running" after the first shot, and Latoya testified that she saw appellant raise the gun and aim it, saying she saw the gun "the entire time it was up" and that "when [appellant] was shooting, he was running kind of backwards with the gun." However, she also agreed when she was asked on cross-examination whether she "heard the shots ring out as [she was] running" and whether she was "running away from that situation." Latoya testified that she heard four or five gunshots, and she did not remember what appellant was wearing or whether he was wearing a hat.

Juliana Gibbs was out with Latoya and Christopher on the night of the shooting and said that 6th Street that night "was chaos"—"[t]here was people everywhere. There was fights everywhere. There were lots of drunk people around. There was a lot of screaming, partying." She testified that she found herself in a crowd surrounding a fight, but she did not

3

"see the actual fighting that was going on." Gibbs heard a commotion and remembered "being pushed really hard, and I remember feeling a lot of pressure" as she was shot. She did not see the gun and only heard gunshots. Gibbs testified that a police officer spoke to her at the hospital, showed her a photograph, and said "this is the person who shot you." She said she did not know appellant and "had never seen him."

Desiree Torres was also shot in the incident. She testified that she saw appellant arguing with a man in a white shirt, who pushed appellant. Appellant then pulled a gun from his waistband using his right hand, and Torres said, "I just hear he's got a gun, I see the gun, and I start running . . . but that's when I got shot." Torres said she was about fifteen feet from appellant and described his clothing as "a red polo and jeans that were kind of saggy, also a black cap, and he had some dreadlocks." She could not remember if she had described appellant's clothing when she gave a statement to the police after the shooting.

Crystal Cordero testified that she was on 6th Street on the night of the shooting and that her friend was shot in her ankle. Cordero testified that she panicked when she heard gunshots. She started to run but saw "a person lying on the ground who appeared lifeless" and thought, "[O]h, my God, I'm running the wrong direction. I'm running in the direction of the gunshots. So I panicked for another second, and when I looked up is when I saw the shooter." Cordero testified that the man was about five-foot, nine-inches tall, slender, African-American, and light skinned and that he "appeared to have cornrows, hair about shoulder length or to the back of his neck." She explained that "[t]he only reason that he stood out to me was because amidst the chaos and everybody running and trying to hide and getaway, he was standing still and his face looked angry. It just didn't match what everybody else was doing." Cordero testified that she saw the man "lowering a black handgun in his right hand" and explained that

4

she saw him "[a]fter the shots had been fired." She did not recall what the shooter was wearing and thought that his cornrows were down and not pulled into a ponytail. Cordero was not asked to identify appellant at trial as the shooter.

Police investigators found five cartridge casings at the scene, four of which were located in the middle of the street across from Voodoo Doughnuts, in close proximity to a black baseball hat. The hat was not subjected to DNA or other testing and the witnesses could not say with certainty that it was the hat appellant wore in one of his social media photos; however, one witness testified that both hats have a brand-name sticker and a rectangular price sticker and that the position of the stickers on both hats are "consistent" with each other. The police also recovered a cell phone and a red baseball hat belonging to Walker, apparently dropped as he fled, on or near the sidewalk in front of Voodoo Doughnuts; found two bullet holes in nearby structures; and recovered four "projectiles" from the scene or the victims. A firearms examiner tested the casings and projectiles and testified that all four of the projectiles were "consistent with a 40-caliber," were "full metal jacket with a flat point design," and had "rifling characteristics consistent with a Glock type firearm with polygonal riffling." However, "because they were fired through a polygonal rifle barrel," the expert could not positively state that they were fired from the same gun, although neither could he eliminate that possibility. As for the casings, four of them were 40-caliber Smith & Wesson cartridges marketed by Federal, and the firearms examiner testified that they were "positively identified as having been fired in the same gun" and had characteristics "consistent with Glock-type firearms," although he could not say the particular type of gun. He tested a fifth cartridge that was found at the scene and determined that it was a different brand of ammunition fired by a different gun.

5

Finally, the State presented testimony that about thirty-five minutes after the murder, a man matching appellant's description, driving his vehicle, and using his credit card bought gas about nine miles from the scene. A detective testified that the security footage from the gas station shows that the man's hair is in dreadlocks that are darker at the top and lighter in color at their ends. Later that day, July 31, appellant's vehicle was "discovered abandoned" "fairly close" to his residence, and appellant's sister's vehicle was seen in Shreveport, Louisiana at about 1:00 a.m. on August 1 and then found abandoned in Birmingham, Alabama. The detective also testified that appellant started "turning his phone on and off in what we believed to be an effort to avoid detection" and then "completely switched to a different phone altogether, and the number we had been tracking went silent." Appellant was ultimately arrested in Georgia on August 3, by which time appellant "had drastically changed his appearance." In a jail call between appellant and his wife, Shante Walker, he tells Shante that he rode in a train boxcar to Atlanta, Georgia, and Shante tells appellant that it took her thirty minutes to explain to her mother "how you took your dreads out."

**STANDARD OF REVIEW**

In assessing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and ask whether a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We ask "whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence," *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011), and the Court of Criminal Appeals has explained that a jury does not err in reaching one of multiple "permissible views of the evidence" as long as it has not

6

"come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions,'" *Braughton*, 569 S.W.3d at 608 (quoting *Hooper v. State*, 214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007); *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006)). We presume that the jury as factfinder resolved any conflicting inferences in favor of its verdict and defer to that resolution—we may not reevaluate the jury's determinations of the weight and credibility of the evidence or substitute our own judgment for that of the jury. *Id.*

## EVIDENCE OF IDENTITY

In his first issue, appellant argues that the evidence is insufficient to prove he was the shooter that night. He insists that "[a]ny number of guns" could have fired the fatal shot, noting that the firearms examiner could not conclusively state that all of the spent bullets were fired by the same gun, that a fifth cartridge found at the scene was determined to have come from a different gun, and that there was testimony that "shots are fired frequently in that part of town." He further notes that Torres only saw him holding a gun and did not see him actually fire the gun and argues that, at best, the State proved that he pointed a gun at Walker, and then "only if Latoya Walker's testimony is believed."

Appellant asserts that the State did not present a witness who could testify that they actually watched appellant fire his gun toward Teqnika. However, several witnesses provided testimony linking appellant to a gun. Walker testified that he pushed appellant because he was nervous about appellant "fidgeting" with his waistband, where Walker saw a "print" of a gun. Cordero testified that immediately after the shooting, she saw a man who matched appellant's appearance standing still—in contrast to the chaos around him—lowering a handgun, and looking angry, and Torres testified that she saw appellant with a gun just before the shooting

7

started. Further, Latoya testified that she saw appellant pull a gun from his waistband, fire one shot down toward the ground; that he raised and aimed the gun, "shooting" as he moved backwards; and that she heard four or five shots as she ran away. In addition, there was expert testimony that four of the five cartridges found at the scene were 40-caliber cartridges fired from the same gun, "consistent with Glock-type firearms,"[2] and that the four projectiles retrieved from the victims and the scene were "consistent with a 40-caliber" and had "rifling characteristics consistent with a Glock type firearm." A police officer testified that various witnesses gave differing descriptions of the shooter's clothing but that inconsistency in such details is not concerning because in such a chaotic scenario, "it's typical that [witnesses] may confuse the clothing articles that are being worn by one person as opposed to another. It's not that concerning." Finally, the Court of Criminal Appeals has explained that "a factfinder may draw an inference of guilt from the circumstance of flight," *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007), and the State presented evidence that appellant fled Austin after the shooting, abandoning his car in Austin and driving his sister's car through Louisiana and Alabama before abandoning it and getting onto a train to Georgia, and changed his appearance by removing his distinctive dreadlocks.

Based on the evidence presented to the jury and reasonable inferences that can be drawn therefrom, a reasonable jury could have concluded beyond a reasonable doubt that it was appellant who fired the gunshot that killed Teqnika. We overrule appellant's first issue.

---

[2] The cartridges were found near a black baseball hat that was consistent with a hat that appeared in appellant's social media posts.

**FIRING INTO A CROWD**

In his second issue, appellant argues that there was no evidence that he fired a gun in the direction of a crowd of people. He contends that there were many people in the area and that discharging a firearm in a crowded area "is not the same as firing into or in the direction of a crowd." Because the jury charge allowed the jury to find him guilty if it found one of several manner and means of committing the offense, including several that required a finding that he fired into a crowd, appellant argues, some of the jurors might have convicted him based on a manner and means for which there was insufficient evidence.[3]

Appellant asserts that "[d]ischarging a firearm while in a place where there are many people is not the same as firing into or in the direction of a crowd of people" but cites to no authority for that proposition. Further, the evidence shows that 6th Street in general was crowded and that specifically there was a large number of people at or near Voodoo Doughnuts, with Werner testifying that the people were "shoulder to shoulder," from "sidewalk to sidewalk," and with Sabrina's brother-in-law testifying that he, Teqnika, and their friends waited for their donuts for "a tremendously long time." "Crowd," in normal usage, is defined as "a large number of persons especially when collected together" or "a large number of things close together," Crowd, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/crowd (last visited Jan. 29, 2021), or as a "large number of people gathered together in a disorganized or unruly

---

[3] The jury was instructed to find appellant guilty of murder if it determined that he: intentionally or knowingly shot Teqnika with a firearm; committed an act clearly dangerous to human life with an intent to cause serious bodily injury by shooting a firearm at a crowd of individuals; intentionally or knowingly committed or attempted to commit aggravated assault with a deadly weapon and then while fleeing committed an act clearly dangerous to human life by shooting a firearm at a crowd of individuals; or intentionally or knowingly committed or attempted to commit the felony offense of deadly conduct by shooting a firearm at a crowd of individuals.

way," Crowd, Lexico.com, https://www.lexico.com/en/definition/crowd (last visited Jan. 29, 2021). And several people in the crowded area were struck by bullets, thus supporting a finding that appellant fired "into" or "in the direction of" the crowd. We hold that the evidence is thus sufficient to support a conclusion that appellant fired his firearm in the direction of a crowd. The Court of Criminal Appeals has held that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any of the acts charged." *Kitchens v. State*, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)). Accordingly, we overrule appellant's second issue.[4]

## CONCLUSION

We have overruled appellant's issues. We therefore affirm the trial court's judgment of conviction.

_____
Darlene Byrne, Chief Justice

---

[4] The Court of Criminal Appeals has further explained that when a jury charge alleges alternative theories, "harm must be measured 'at least in part, against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.'" *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (quoting *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002)). In *Sanchez*, the Court of Criminal Appeals held that although the charge erroneously allowed the jury to convict the defendant for causing the victim's death by unknown manner and means, the defendant was not harmed because "the jury could have convicted appellant for murder without being unanimous in its determination as to the manner or means of death" and because all of the charged alternatives "required the jury to be convinced beyond a reasonable doubt that appellant caused the death of the complainant, and the evidence at trial established this." *Id.*

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: February 18, 2021

Do Not Publish