******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* JACQUES CARTER
### (SC 20779)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The defendant appealed from the judgment of conviction of home invasion and burglary in the first degree. The defendant claimed, inter alia, that the trial court improperly allowed the jury to determine that the air gun he had been carrying during the home invasion constituted a deadly weapon for purposes of the offenses of which he was convicted. *Held*:

The question of whether the air gun at issue was a deadly weapon at the time of the offenses was subject to plenary review because the disputed issues in this case were not about the factual aspects of how the gun operated but, rather, concerned the meaning of the language in the statute (§ 53a-3 (6)) defining "deadly weapon," as applied to the undisputed facts.

The defendant's conviction of home invasion and first degree burglary could not stand because the air gun at issue was not one from which a shot could be readily discharged, as the gun, at the time of the home invasion, was modified such that significant effort would have been needed before it could be loaded and/or discharged.

The trial court's legal error in instructing the jury with respect to the deadly weapon element of the home invasion and first degree burglary charges precluded application of the general verdict rule as an alternative ground for affirming the judgment of conviction.

Argued March 20—officially released July 25, 2024*

*Procedural History*

Substitute information charging the defendant with the crimes of home invasion, burglary in the first degree, attempt to commit assault in the second degree with a firearm, and assault in the third degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Pavia, J.*; verdict and judgment of guilty of home invasion and burglary in the first degree, from which the defendant appealed to this court. *Reversed*; *new trial*.

* July 25, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, assistant state's attorney, with whom were *Deborah P. Mabbett*, supervisory assistant state's attorney, and, on the brief, *David R. Applegate*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. Following a jury trial, the defendant, Jacques Carter, was convicted of home invasion in violation of General Statutes § 53a-100aa (a) (2) and burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) stemming from a break-in at a Danbury apartment in 2016. During the break-in, the defendant was armed with a Crosman Vigilante air gun that was loaded with pellets, but the gun had no carbon dioxide ($CO_2$) cartridge installed, and the chamber where the $CO_2$ cartridge would be installed was sealed off with duct tape. To obtain a conviction under either of the foregoing statutes, as charged in the information in this case, the state had to establish, among other things, that the defendant was "armed with . . . a deadly weapon or dangerous instrument." On appeal, the defendant's primary contention is that the trial court erroneously allowed the jury to determine that the air gun he carried during the break-in constituted a deadly weapon. We agree that, as a matter of law, an air gun in which a $CO_2$ cartridge cannot be readily installed is not a deadly weapon. Accordingly, we reverse the judgment of the trial court.

I

The following facts, which the jury reasonably could have found, and procedural history govern our disposition of this appeal. In the early morning hours of September 3, 2016, the defendant broke into the Danbury apartment where Consuela Riley lived. The defendant

wore two T-shirts over his head as a makeshift mask, and he was armed with a Crosman Vigilante air gun. The weapon is designed to look like a revolver, but it is powered by a $CO_2$ cartridge, and it fires 4.5 millimeter BBs or similar .177 caliber ammunition.

The defendant entered the apartment through a basement window. Soon after entering, he encountered one of Riley's sons, Christopher Latham. Latham confronted the defendant but yelled out and briefly backed off when he observed the defendant holding what appeared to be a firearm. A series of physical altercations ensued between Latham and the defendant. Latham pursued the defendant as he attempted to exit the apartment through the window of Latham's basement bedroom. At some point during the defendant's efforts to leave the apartment, the defendant tried to "gun butt" Latham two or more times by turning the air gun around and swinging the handle end at him. Ultimately, the defendant ran upstairs, past Riley, and exited through a backdoor.

Latham continued to pursue the defendant outside the apartment, where the two continued to wrestle, and Latham managed to disarm the defendant. Latham and his cousin, Dante Hodge, who was staying at the apartment, then succeeded in removing the T-shirts from the defendant's face, allowing Latham to identify the defendant, who was a former schoolmate and football teammate of Latham's, before he fled the scene.

When the police arrived on the scene, they found the air gun in the grass outside the apartment. The weapon was fitted with an ammunition cartridge that had a ten pellet capacity; at the time, eight of the weapon's slots were loaded with pointed pellets. Multiple layers of black duct tape were wrapped around the handle, which conceals the empty chamber designed to hold a $CO_2$ cartridge. No $CO_2$ cartridge was installed when the air

gun was recovered, and no $CO_2$ cartridge was recovered from the scene.

Prior to trial, the state sent the air gun to the Connecticut Forensic Science Laboratory for testing. Laura Grestini, a forensic scientist, removed the duct tape and tested it for fingerprints. Sergeant David Cooney subsequently loaded the weapon with a $CO_2$ cartridge he had in stock. Cooney testified that, to load a $CO_2$ cartridge, one must pop off the handle of the air gun, place the cartridge inside the handle of the gun, and use a screw inside to push the cartridge up into the air gun. Cooney further testified that the air gun could not have fired pellets without a $CO_2$ cartridge installed but that he was able to successfully test-fire the gun after installing a cartridge. Sergeant James Grundman concurred that, in order to operate the weapon, a $CO_2$ cartridge needs to be installed.

Cooney testified that the pointed head pellets found in the weapon were "made for small game hunting and nuisance control," such as to kill "squirrels, chipmunks, [and] things like that." A warning label on the air gun stated in relevant part: "Not a toy. Misuse or careless use may cause serious injury or death."

The defendant was arrested and charged in a four count information with home invasion and first degree burglary, as well as attempt to commit assault in the second degree with a firearm and assault in the third degree. The home invasion and first degree burglary counts both charged the defendant, in the alternative, with having been armed with a deadly weapon or dangerous instrument while committing these crimes.

The case was tried to a jury. After the prosecutor presented the state's case, defense counsel moved for a judgment of acquittal as to all four counts of the state's information. With respect to the home invasion and first degree burglary charges, defense counsel

argued that the state had not proven that the air gun was operable,[1] and, thus, the gun was not a deadly weapon within the meaning of General Statutes § 53a-3 (6); nor had the state proven that the air gun was used in a way that made it a dangerous instrument. The trial court denied the motion and later instructed the jury: " 'Deadly weapon' is defined by statute as any weapon, whether loaded or unloaded, from which a shot may be discharged. If the weapon is a firearm, it may be unloaded, but it must be in such condition that a shot may be discharged from it. Thus, if the weapon is loaded but not in working order, it is not a deadly weapon. If the weapon is unloaded but in working order, it is a deadly weapon." Then, in accordance with the state's alternative theory that the defendant was armed with a dangerous instrument, the trial court instructed the jury that a " '[d]angerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury."

The jury returned a verdict of guilty on the home invasion and first degree burglary charges but not guilty on the assault charges. The trial court rendered judgment consistent with the verdict and sentenced the defendant to a total effective term of sixteen years of incarceration, suspended after twelve years, and five years of probation. At sentencing, the trial court addressed the defendant's motion for a new trial, which renewed his claim that an air gun without a $CO_2$ cartridge installed cannot qualify as a deadly weapon. The trial court again denied the motion, implying that, in the court's view, the issue was one of fact for the jury to resolve.

---

[1] At times, we will use the word "operable" as shorthand for "from which a shot may be discharged" in General Statutes § 53a-3 (6).

On appeal, the defendant contends that the trial court (1) should have concluded as a matter of law that, without a $CO_2$ cartridge installed or the capacity to have one readily installed, the air gun was not a deadly weapon at the time of the break-in, and the court should have permitted the jury to consider only whether he had used the air gun as a dangerous instrument when he allegedly attempted to "gun butt" Latham, (2) incorrectly instructed the jury on that same issue, and (3) should have instructed the jury that it had to reach a unanimous decision as to whether the defendant had used the air gun as a deadly weapon or dangerous instrument. Because we agree with the defendant's first claim, we need not address his instructional claims or the state's argument that those claims were not properly preserved.

II

A

Before we address the defendant's primary challenge to his conviction, we first must consider the state's argument that the question of whether the air gun at issue was a deadly weapon is a factual question rather than a legal question. This is critical to our analysis for two reasons: the nature of the question dictates our standard of review and whether the general verdict rule applies to this case.

First, with respect to the standard of review, if the state is correct that the jury was free to determine, as a matter of fact, that the air gun was a deadly weapon, then deference is owed to the jury's determination that it was, and we are compelled to uphold the verdict unless there was insufficient evidence in the record to support that determination. See, e.g., *State* v. *Adams*, 327 Conn. 297, 304–305, 173 A.3d 943 (2017). By contrast, if the issue is a purely legal one, as the defendant

contends, then our review is plenary. See, e.g., *State* v. *Ramos*, 271 Conn. 785, 791, 860 A.2d 249 (2004).

Second, the legal status of the claim dictates in large part whether the state is correct that, regardless of the merits of the defendant's arguments, the judgment can be affirmed pursuant to the general verdict rule. See, e.g., *State* v. *Chapman*, 229 Conn. 529, 539, 643 A.2d 1213 (1994); see also, e.g., *Turner* v. *United States*, 396 U.S. 398, 420, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970). Specifically, the state contends that, even if we reject the theory that the air gun qualified as a deadly weapon, there was sufficient evidence for the jury to find the defendant guilty on the state's alternative theory that the defendant had used the air gun as a dangerous instrument when he attempted to "gun butt" Latham with it.

Under *Griffin* v. *United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), and its progeny, when a jury finds a criminal defendant guilty under a single count charging the commission of an offense by two different means, and there is sufficient evidence to support the conviction on one theory but not the other, the conviction may be sustained in the face of a due process challenge in accordance with the principle that jurors, who are well equipped to analyze and weigh evidence, must be presumed to have relied on the factually adequate theory. See id., 50–60. This principle does not apply, however, when the trial court sends the case to the jury on two alternative theories, one of which fails to come within the statutory definition of the crime or is otherwise based on an erroneous view of the law, because, "[w]hen . . . jurors have been left the option of relying [on] a legally inadequate theory, there is no reason to think that [the jurors'] own intelligence and expertise will save them from *that* error." (Emphasis added.) Id., 59; accord *State* v. *Chapman*, supra, 229 Conn. 539. When the error is a legal error, rather than

a matter of the sufficiency of the evidence,[2] and the jury has been permitted to find a criminal defendant guilty under either a legally valid or a legally invalid theory, the conviction must be reversed "unless [the reviewing court] can determine with absolute certainty that the jury based its verdict on the ground on which it was correctly instructed." (Internal quotation marks omitted.) *United States* v. *Gonzalez*, 93 F.3d 311, 322 (7th Cir. 1996); see, e.g., *State* v. *Cody M.*, 337 Conn. 92, 116, 259 A.3d 576 (2020) (permitting finding of harmless error if jury necessarily found facts to support conviction on legally valid theory). See generally, e.g., *United States* v. *Gonzalez*, supra, 318–22 (discussing how courts have handled convictions under 18 U.S.C. § 924 (c), which provides for five year term of imprisonment for anyone who "uses or carries a firearm" during, and in relation to, drug trafficking crimes, following United States Supreme Court's decision in *Bailey* v. *United States*, 516 U.S. 137, 142–50, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995), which narrowed definition of "uses" in that statute (internal quotation marks omitted)).

In the present case, both parties direct our attention to Connecticut cases that appear to support their respec-

---

[2] The United States Supreme Court explained in *Griffin* that, although a conviction based on insufficient evidence is also a *legal* error, in the sense that all errors corrected by appellate courts can be characterized as legal errors, it is not a legal error in the sense of a mistake as to what the law says or requires (which, conversely, is not a sufficiency of the evidence issue). See *Griffin* v. *United States*, supra, 502 U.S. 58–59. Notably, *Griffin*, in applying this distinction, relied heavily on *Yates* v. *United States*, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), overruled on other grounds by *Burks* v. *United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). See *Griffin* v. *United States*, supra, 58–59. In *Yates*, as in the present case, the case had been sent to the jury under two distinct theories, one of which the United States Supreme Court held was broader than permitted by the statutory language. See *Yates* v. *United States*, supra, 300, 303–304. Because it was unclear from the jury instructions whether the jury necessarily had predicated its guilty verdict on the other, valid theory of liability, the United States Supreme Court concluded that the general verdict theory did not apply and vacated the convictions. See id., 303, 311–12.

tive positions as to the fact/law issue. In fact, both parties are, to some extent, correct; whether this particular air gun qualified as a deadly weapon at the time of the break-in is a mixed question of law and fact. See, e.g., *State* v. *DeCiccio*, 315 Conn. 79, 88–96, 101 n.12, 105 A.3d 165 (2014) (court determines as matter of law core meaning of statutory term "dirk knife," and jury decides whether weapon at issue falls within that core meaning, assuming it reasonably could).

For purposes of both §§ 53a-100aa (a) (2) and 53a-101 (a) (1), the definition of "deadly weapon" is furnished by § 53a-3. That statute provides in relevant part: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." General Statutes § 53a-3 (6).

The factual aspects of identifying a deadly weapon, which were properly the province of the jury, involve questions about what make and model of air gun the defendant used, how it operates, whether it was loaded with BBs or pellets and a filled[3] $CO_2$ cartridge was installed at the time of the break-in, whether the $CO_2$ chamber was sealed off with tape, whether the weapon would or could have fired a shot at that time had the defendant pulled the trigger with no $CO_2$ cartridge installed, whether it was in good working order, such that it fired normally when Sergeant Cooney later installed a $CO_2$ cartridge, and whether it was potentially lethal. Those are questions that the jury could resolve on the basis of the testimony presented and a physical examination of the air gun and other exhibits. See, e.g., *State* v. *Bradley*, 39 Conn. App. 82, 91, 663 A.2d 1100 (1995) (whether gun that was operable when recovered by police had been operable during commission of crime was question of fact for jury, to be resolved by

---

[3] We use the term "filled" as shorthand for a cartridge that has sufficient CO2 to discharge at least one shot.

direct and circumstantial evidence), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996); *State* v. *Coauette*, 601 N.W.2d 443, 445 (Minn. App. 1999) (discussing various aspects of weapon that involve questions of fact).

In this case, all of those factual matters are undisputed. The case involves a Crosman Vigilante air gun, in good working order, that was loaded with pointed pellets but that did not have a $CO_2$ cartridge installed, and that had a cartridge compartment that was taped off with multiple layers of duct tape. It is agreed that no shot would have discharged had the defendant pulled the trigger, unless he first removed the tape and installed a filled $CO_2$ cartridge. Only then could a shot have been discharged.

The disputed questions in this case are not about those factual aspects of *how* the gun operates but, rather, about what the language of the statute means as applied to those facts. The question is *whether*, for purposes of § 53a-3 (6), a Crosman Vigilante air gun, in the condition described, is a weapon "from which a shot may be discharged . . . ." The answer to that question hinges on the meaning of the statutory phrase "may be discharged" in § 53a-3 (6). The issue is a matter of legislative intent, subject to our de novo review. See, e.g., *State* v. *Grant*, 294 Conn. 151, 157, 982 A.2d 169 (2009) ("[w]hether a BB gun constitutes a firearm under § 53a-3 (19) presents a question of statutory interpretation"); *State* v. *Hardy*, 278 Conn. 113, 119, 896 A.2d 755 (2006) (whether air guns can qualify as deadly weapons capable of discharging shots was question of statutory interpretation); *State* v. *Guzman*, 110 Conn. App. 263, 274–76, 955 A.2d 72 (2008) (applying *Hardy* and concluding that how particular air gun operates is question of fact but whether it qualifies as operable, lethal weapon for purposes of statute is question of law), cert. denied, 290 Conn. 915, 965 A.2d 555 (2009); *State* v. *Belanger*, 55 Conn. App. 2, 7, 738 A.2d 1109 (suggesting

that, as matter of law, operability implies that firearm is fully assembled), cert. denied, 251 Conn. 921, 742 A.2d 359 (1999), cert. denied, 530 U.S. 1205, 120 S. Ct. 2200, 147 L. Ed. 2d 235 (2000); *State* v. *Coauette*, supra, 601 N.W.2d 445–46 (whether paintball gun with stipulated features qualifies as firearm for purposes of statute must be treated as question of law "to avoid creating criminal offenses not contemplated by the legislature").

We therefore reject the state's argument that the judgment can be affirmed under the general verdict rule. As we explain in part II B of this opinion, there are two related but conceptually distinct defects in the defendant's convictions. First, through no fault of the trial court, the jury was not fully and accurately instructed as to the governing legal standard. Construing the relevant statutory language for the first time, we conclude that the requirement in § 53a-3 (6) that a deadly weapon be a weapon "from which a shot may be discharged" demands some degree of immediacy. Although the weapon may require loading, it otherwise must be one readily capable of firing a shot during the commission of the crime. See part II B of this opinion.

The jury was not aware of this requirement. During her closing argument, the prosecutor argued to the jury that the statute required only that the gun be "operable," "in working order," "functional," or "a functioning gun," and that this element of the crime had been established through Cooney's testimony that he was able to fire the weapon at the Danbury Police Department's crime scene investigation unit after the duct tape was removed and a $CO_2$ cartridge was installed. The trial court then instructed the jury as follows with respect to the deadly weapon element of the home invasion and first degree burglary charges: " 'Deadly weapon' is defined by statute as any weapon, whether loaded or unloaded, from which a shot may be discharged. If the weapon is a firearm, it may be unloaded, but it must be in such

condition that a shot may be discharged from it. Thus, if the weapon is loaded but not in working order, it is not a deadly weapon. If the weapon is unloaded but *in working order*, it is a deadly weapon." (Emphasis added.) In other words, the jury was led to believe, and then instructed, that the "from which a shot may be discharged" language in § 53a-3 (6) meant only that the weapon must be in working order and not that it must be readily capable of discharging a shot at the time of the crime. Accordingly, it is reasonably possible that one or more jurors operated under the mistaken belief that the defendant could be convicted under the deadly weapon prongs of §§ 53a-100aa (a) (2) and 53a-101 (a) (1) if the state proved nothing more than that the air gun was not broken or defective and that it could be rendered operational by taking the time to remove the duct tape, to open the chamber, and to install a fresh $CO_2$ cartridge. This kind of legal error precludes application of the general verdict rule. See, e.g., *Yates* v. *United States*, 354 U.S. 298, 311–12, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), overruled on other grounds by *Burks* v. *United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

The second question, as we will discuss in part II B of this opinion, is whether, if the jury had been correctly instructed as to the statutory definition of a "deadly weapon," there was sufficient evidence to support a conviction. If there was, then, on retrial before a properly instructed jury, the state again could attempt to establish the defendant's guilt under both the deadly weapon and dangerous instrument theories. But, because we conclude that, on the unique facts of this case, no reasonable jury could find the defendant guilty on the deadly weapon theory *once properly instructed in the law*, a guilty verdict on that theory is not permissible, and the state will be limited on retrial to establishing that

the defendant used the air gun as a dangerous instrument.

Having determined that the general verdict rule does not apply, we proceed to review de novo the question of whether the air gun at issue here was one "from which a shot may be discharged . . . ." General Statutes § 53a-3 (6).

B

Under the unique facts of the present case, it is clear that the defendant's convictions cannot stand because the gun at issue was not one "from which a shot may be discharged . . . ." General Statutes § 53a-3 (6). Specifically, we are persuaded by the defendant's argument that the fact that he would have had to remove multiple layers of duct tape before he could have installed a $CO_2$ cartridge means that, at the time of the break-in, the air gun was not one from which a shot could have been discharged.

Although the parties argue primarily by analogy to various types of weapons, our analysis properly begins with the language of the statute. See General Statutes § 1-2z. Because the key terms in the language at issue— "from which a shot may be discharged"—are not defined in § 53a-3 or elsewhere in the criminal code, we look to the common usage of the terms at the time the statute was enacted. The word "may," for example, was used interchangeably with "can" to denote ability or capability. See, e.g., Webster's Seventh New Collegiate Dictionary (1969) p. 523. But this is compatible with both parties' interpretation of the statute. It may be, as the defendant contends, that there is an immediacy requirement, and a weapon is a deadly one only if a shot may be readily discharged with little to no manipulation, that is to say, the perpetrator need only load ammunition (and, perhaps, take off the safety and remove any trigger lock) to be able to discharge it. Because a shot

cannot be discharged from an air gun that is in the condition the defendant's weapon was in at the time of the break-in, it was not a deadly weapon based on this reading of the statute.

The state, by contrast, reads the statute to require only that the weapon not be broken or missing structural components; it may be a deadly weapon, even if some manipulation, beyond the loading of ammunition, is necessary before a shot can be discharged. Based on this view, if the defendant's air gun was otherwise functioning properly, a shot *may* (hypothetically) be discharged simply by removing the duct tape and installing a filled $CO_2$ cartridge.

In other words, the legislature might have intended to impose liability (1) only when the perpetrator is armed with a weapon that needs simply to be loaded with ammunition to be ready to fire, as the defendant contends, or (2) whenever the perpetrator is armed with a properly functioning weapon that is not broken or defective, but that may require preparation of various sorts before it can be fired, as the state contends. We must determine which of these two facially plausible meanings the legislature intended. Because the statute is ambiguous on this point, we may look to the legislative history. See General Statutes § 1-2z. Before we do, it is helpful to consider further what exactly makes § 53a-3 (6) an ongoing source of confusion and controversy.

Much of the ambiguity arises from the legislature's decision to define a deadly weapon as a weapon that must be operable but need not be loaded. If a weapon, like the air gun in the present case, is unloaded and hence poses no immediate risk of firing, one would think that it should not matter whether it is theoretically operable at the time of the crime.

The legislative history of § 53a-3 (6) sheds light on this ambiguity and favors the defendant's interpretation of the statute, as it demonstrates that, from the outset, there always has been a requirement that a weapon be readily capable of discharging a shot to qualify as a deadly weapon. When the statute was originally enacted in 1969, General Statutes (Supp. 1969) § 53a-3 (6) provided in relevant part that " 'deadly weapon' means any *loaded* weapon from which a shot may be discharged . . . ." (Emphasis added.) It seems clear from the fact that a weapon had to be both loaded and capable of discharging a shot that the legislature intended to impose liability only when a perpetrator was armed with a weapon that was ready to fire, without further manipulation.

This interpretation of the original version of the statute is consistent with how New York courts have construed the statute on which § 53a-3 was modeled. See *New Canaan* v. *Connecticut State Board of Labor Relations*, 160 Conn. 285, 291, 278 A.2d 761 (1971) (when Connecticut statute has been modeled on that of another jurisdiction, "the judicial interpretation . . . accorded [to that other jurisdiction's] act is of great assistance and persuasive force in the interpretation of our own act" (internal quotation marks omitted)). The relevant sections of our penal code were modeled in part on the corresponding proposed provisions of the New York Penal Law. See, e.g., Report of the Commission to Revise the Criminal Statutes (1967) p. 75. The relevant New York provision provides in relevant part: " 'Deadly weapon' means any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged . . . ." N.Y. Penal Law § 10.00 (12) (McKinney Cum. Supp. 2024). In interpreting an earlier version of this provision, the Appellate Division of the New York Supreme Court expressly rejected "the [state's] argument that the [l]egislature

meant 'may be discharged' in the hypothetical sense, rather than in the sense of the gun's immediate capability." *People* v. *Wilson*, 252 App. Div. 2d 241, 246, 684 N.Y.S.2d 718 (1998). That interpretation is consistent with our own conclusion that, as § 53a-3 (6) was originally drafted, a loaded weapon must otherwise be one from which a shot may be readily discharged.

In 1971, the legislature amended § 53a-3 (6), deleting the word "loaded"; see Public Acts 1971, No. 871, § 1; and, in 1973, the legislature added the present "whether loaded or unloaded" language. See Public Acts 1973, No. 73-639, § 1. The question is why the legislature in 1971 eliminated the requirement that a weapon that is used in the furtherance of a crime be loaded but retained the requirement that it be capable of discharging a shot to qualify as a deadly weapon. There is no indication in the legislative history that the legislature made these changes in order to expand the scope of liability to weapons, such as the one at issue, that are in good working order but that have a physical barrier that prevents the loading, pressurization, and discharging of the weapon.

Rather, the parties agree that prosecutors requested the amendments for evidentiary purposes. Specifically, even if a gun was loaded during the commission of a crime, prosecutors might have difficulty establishing that fact beyond a reasonable doubt if all of the ammunition was removed or discharged before the gun was recovered. Removing the "loaded" element from the definition of "deadly weapon," and requiring that the state prove only that the weapon was otherwise capable of discharging a shot, eliminated a potentially significant barrier to prosecuting crimes that were committed with guns that could actually be fired at the time of the criminal act. See, e.g., 16 H.R. Proc., Pt. 13, 1973 Sess., pp. 6784–85, remarks of Representative James F. Bingham.

Thus, this legislative history reveals that the purpose of the amendments was merely to assist the state in overcoming the evidentiary difficulty that otherwise could occur in proving that a gun was loaded at the time a crime was committed. There is no indication that the legislature intended to further expand the meaning of the statutory language "from which a shot may be discharged . . . ." General Statutes § 53a-3 (6). Accordingly, our review of the language and evolution of the statute, the legislative history, and the New York courts' interpretation of the statute on which § 53a-3 (6) was modeled persuades us that § 53a-3 (6) retains an immediacy requirement. To qualify as a deadly weapon, although it may be unloaded, a weapon must otherwise be readily capable of discharging a shot at the time the crime is committed.[4]

Applying that definition to this case, we conclude that an air gun that has been modified so that significant effort must be expended before the weapon can be loaded and/or discharged is not a weapon that is readily capable of discharging a shot. In this case, the handle of the air gun was sealed off from top to bottom by five individual strips of duct tape, ranging in length from approximately ten to twenty-two inches, that is to say, enough to encase the $CO_2$ chamber as many as fifteen times. Peeling off that much tape would take significantly longer and pose more of an impediment than unlocking and removing a trigger lock or otherwise restoring a disabled weapon to a condition readily capa-

---

[4] We need not resolve the debate between the parties as to whether the weapon at issue in this case would have qualified as a deadly weapon under the statute if the cartridge chamber had not been taped off. More broadly, it is not immediately clear how the statute (especially terms such as "loaded or unloaded"), which presumably was drafted with conventional firearms in mind, applies to air guns and other weapons constructed around fundamentally different propulsion systems. Given the frequency with which crimes involving these types of weapons are prosecuted, we invite the legislature to provide additional guidance.

ble of firing a shot. Certainly, it would require far more time and effort than simply loading a bullet or clip into a conventional firearm. The legislative history of § 53a-3 (6) supports our conclusion that such a weapon is not one from which a shot may be readily discharged.

As we discussed, the jury was never instructed as to any immediacy requirement, or that a weapon must be readily capable of discharging a shot to qualify as a deadly weapon for purposes of § 53a-3 (6). Indeed, counsel for both parties, as well as the trial court, all appeared to agree that, as charged, the jury reasonably could have concluded that the defendant's air gun qualified as a deadly weapon at the time of the break-in. Due process will not permit the state to obtain a conviction for conduct that the legislature has not chosen to criminalize, and, here, the legislature did not intend to impose a deadly weapon enhancement for a crime involving a weapon, such as the defendant's air gun, that was incapable of discharging a shot during the commission of the crime without substantial preparation. Thus, because we cannot be confident that the defendant's convictions were predicated on a theory of liability authorized by the statute, those convictions cannot stand.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.